UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| In re:  GUIDANT CORP. IMPLANTABLE DEFIBRILLATORS PRODUCTS LIABILITY LITIGATION | MDL No. 05-1708 (DWF/AJB) |
|---|---|
| This Document Relates to All Actions | **MEMORANDUM AND ORDER REGARDING GUIDANT'S MOTION TO DISMISS THE MEDICARE SECONDARY PAYER AND THIRD-PARTY PAYER CLAIMS IN THE MASTER COMPLAINT** |

INTRODUCTION

This matter came before the Court on March 6, 2007, pursuant to a Motion to Dismiss the Medicare Secondary Payer Claims and the Third-Party Payer in the Master Complaint brought by Guidant Corporation, Guidant Sales Corporation, Cardiac Pacemakers, Inc., and Boston Scientific Corporation (collectively, "Guidant").  For the reasons set forth below, the Court grants Guidant's Motion.

BACKGROUND

For the purposes of this Motion, the Court focuses on the allegations in the Master Complaint.  The Master Complaint alleges claims against Guidant for the marketing, manufacturing, distribution, sales, and eventual recall of certain allegedly defective pacemakers and implantable cardioverter defibrillators ("ICDs").   A pacemaker is a device that is implanted in a patient to primarily treat abnormally slow heart rhythms.  An ICD is a device that is implanted in a patient with certain ventricular arrhythmias or with a risk of having such arrhythmias.  It monitors a patient's heart rhythm and, if needed,

acts to correct or restore that rhythm.  An ICD can function both as a pacemaker and a defibrillator.

Briefly, Plaintiffs allege that Guidant was aware of a short-circuiting failure with one of its ICDs, the VENTAK PRIZM 2 DR, Model 1861 ("1861"), as early as February 2002.  Despite this knowledge, Plaintiffs assert that Guidant did not inform the Food and Drug Administration ("FDA"), doctors, patients, or the public of the problem until May 2005, shortly before a *New York Times* article was published about the death of a Minneapolis man allegedly caused by a failure of an 1861 ICD.  During that time, Plaintiffs assert that Guidant continued to sell 1861 ICDs that it knew were defective and continued to seek FDA approval of new pacemakers and ICDs, without informing the FDA of the known defects.  In June 2005, Guidant issued a national recall of 1861 ICDs and sent doctors and patients letters about the recalled devices.  Guidant informed the patients that it would pay for certain out-of-pocket costs and, if needed, a new Guidant ICD, as a result of the recall.  Guidant's offer did not include reimbursement for expenses covered by Medicare or a patient's health insurance and incurred in connection with the recalled ICDs or the replacement ICDs.

Based on these events and similar but separate events concerning other pacemakers and ICDs manufactured by Guidant, three groups of plaintiffs—individual device recipients, one plaintiff under the Medicare Secondary Payer ("MSP") statute, and third-party payers ("TPP")—allege claims against Guidant.  Pursuant to Federal Rule of Civil Procedure 12(b)(6), Guidant now moves to dismiss the MSP and TPP claims for lack of subject matter jurisdiction on the basis that the MSP and TPP Plaintiffs do not

have standing to pursue their claims and that the MSP and TPP Plaintiffs have failed to state a claim upon which relief can be granted.

## DISCUSSION

**I.      Standing**

Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6), is the proper vehicle with which to seek dismissal of a claim for lack of federal subject matter jurisdiction. *Compare* Fed. R. Civ. P. 12(b)(1) with Fed. R. Civ. P. 12(b)(6).  A motion to dismiss for lack of subject matter jurisdiction may challenge a plaintiff's complaint either on its face or on the factual truthfulness of its averments.  *Osborn v. United States,* 918 F.2d 724, 729 n.6 (8th Cir. 1990).  Where, as here, a party makes a "facial attack," the non-moving party receives the same protections as it would defending against a motion under Rule 12(b)(6).  *Id*.

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  A court is, however, "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."  *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002).  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  A court may consider the complaint, matters of public record, orders, materials embraced by the

complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

The threshold issue to be addressed is whether the MSP and TPP Plaintiffs have standing to have this Court decide the merits of their claims. The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). If a plaintiff lacks standing, a district court has no subject matter jurisdiction over the matter and must dismiss the case. *Young Am. Corp. v. Affiliated Computer Servs., Inc.*, 424 F.3d 840, 843 (8th Cir. 2005). A party invoking the jurisdiction of the federal courts must meet both the constitutional requirements of Article III and the prudential limitations crafted by the courts.[1]T *Lujan*, 504 U.S. at 559-60 (1992).

Article III of the Constitution limits the power of the federal courts to deciding only actual "cases" and "controversies." U.S. Const., art. III, § 2, cl. 1. To establish constitutional Article III standing, a plaintiff must demonstrate (1) an injury-in-fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood

---

[1]   Although not at issue in this motion, the United States Supreme Court has defined certain prudential considerations to guide questions of standing. First, a plaintiff may not assert a "generalized grievance" that is suffered by all or a large class of citizens. *Schleshinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974). A plaintiff must also assert his or her own legal rights, rather than the rights of third parties, in order to have standing to sue in federal court. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Finally, a plaintiff's complaint must fall within the "zone of interests to be protected or regulated by statute or constitutional guarantee in question." *Valley Forge Christian Coll. v. Americans United For Separation of Church and State*, 454 U.S. 464, 475 (1982).

that a favorable decision by the court will redress the alleged injury. *Lujan,* 504 U.S. at 560. These constitutional requirements of standing limit federal courts to deciding only cases where the plaintiffs can show a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751 (1984).

With these guidelines in mind, the Court considers whether the plaintiffs named in the Master Complaint have standing to allege the MSP and TPP claims.

### A. MSP Claims

#### 1. The MSP Statute

Medicare is a federal health insurance program that benefits persons over 65 and the disabled. The MSP was enacted in 1980 and designed to "reduce Medicare costs by making the government a secondary provider of medical insurance coverage when a Medicare recipient has other sources of primary coverage." *Thompson v. Goetzmann*, 337 F.3d 489, 495 (5th Cir. 2003). The statute provides that a Medicare payment "may not be made . . . with respect to any item or service to the extent that payment has been made or can reasonably be expected to be made" under a "primary plan." 42 U.S.C. § 1395y(b)(2)(A). In this way, the MSP makes Medicare the secondary payer for medical services provided to Medicare beneficiaries whenever payment is available through a primary payer.

The MSP's definition of "primary plan" has expanded over the years to include a "group health plan, . . . workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance." 42 U.S.C.

5

§ 1395y(b)(2)(A)(ii). "An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by failure to obtain insurance or otherwise) in whole or in part." *Id*.

Since the existence of other insurance coverage is sometimes unknown, the MSP allows Medicare to make a conditional payment to cover medical expenses and then requires a primary plan to later reimburse the Medicare Trust Fund. 42 U.S.C. § 1395y(b)(2)(B)(i)-(ii). To facilitate recovery of conditional payments, the MSP provides for a direct government action against any entity that was responsible for payment under a primary plan but failed to pay it, 42 U.S.C. § 1395y(b)(2)(B)(iii), and it also subrogates the United States to the rights of a Medicare beneficiary to collect payment owing under a primary plan for items already paid by Medicare, 42 U.S.C. § 1395y(b)(2)(B)(iv). In addition, the MSP creates a private right of action with double recovery to encourage private parties who are aware of non-payment by primary plans to bring actions to enforce Medicare's rights. *See* 42 U.S.C. § 1395y(b)(3)(A).

### 2. Ivens' Claims Under the MSP

Tamela Ivens, a Medicare beneficiary, asserts claims against Guidant under § 1395y(b)(3)(A) of the MSP on behalf of all Medicare beneficiaries who received any of the pacemakers or ICDs at issue in this litigation.[2] Ivens alleges that doctors implanted a Guidant Vitality AVT ICD, Model A1555, in her in January 2004. (Master Compl., ¶ 30.) In August 2005, doctors explanted her ICD and replaced it with a non-Guidant

---

[2] Ivens also alleges individual device recipient claims, but this Order does not concern those claims.

ICD.  (*Id.*)  Medicare paid for her medical expenses related to these procedures.  (*Id.*)  Ivens asserts that the implanting and explanting of a Guidant ICD gives her standing to serve "for the purposes of the Master Complaint as an exemplar and as a private attorney general under the MSP" because Medicare "has paid and is being charged for the medical expenditures resulting from [Guidant's] recalled ICDs."  (*Id.*)

Specifically, based on § 1395y(b)(3)(A), Ivens alleges four counts against Guidant:  (1) Breach of Assumed Contractual Warranty Obligations; (2) Liability as First-Party Insurer Under MSP: Agreement to Pay Medical Costs; (3) Liability as First-Party Insurer Under MSP:  Provision of Express and Implied Warranties; and (4) Liability as Third-Party Insurer Under MSP:  Liability as Holder of a Liability Insurance Policy or Plan.  (*Id.* at ¶¶ 444-470.)   For these claims, Ivens seeks "an award of damages in an amount double the amount paid by Medicare to reimburse healthcare providers for all healthcare services provided to all Medicare beneficiaries resulted from the recalled [ICDs]."  (*Id.* at p. 128.)

### 3. Ivens' Standing Under the MSP

Guidant asserts that Ivens lacks constitutional standing to bring her own claims under the MSP.  Guidant points out that Ivens does not allege that her ICD malfunctioned or even that she incurred any financial injury because, admittedly, Medicare paid her medical expenses.  Moreover, Guidant contends that Ivens lacks standing to bring claims on behalf of other Medicare beneficiaries because Article III standing redresses injuries of the complaining party only and Ivens has not alleged that the alleged injuries suffered by other beneficiaries caused injury to Ivens.

7

Ivens responds that Congress granted her standing in the MSP, as it did for private plaintiffs in the False Claims Act ("FCA"), and that there is no legally significant difference between a *qui tam* FCA action and a MPS private action. She explains that the "MSP private plaintiff, as a substitute attorney general, is not seeking compensation damages for an injury suffered by the plaintiff[,] but is proceeding on behalf of Medicare to sue in order to right an economic wrong done to the government." (Plfs' Opp'n at 8 (quotations omitted)). Accordingly, Ivens contends that she "merely presents the government's claims to be reimbursed for all of Medicare's illegitimate expenditures for Guidant's ICDs." (*Id*. at 13.)

Relying on portions of the Medicare Secondary Payer Manual, Ivens asserts that she has standing to bring the Government's claims because she had a Guidant ICD and is a Medicare beneficiary. She contends that cases holding that plaintiffs lack standing to bring MSP claims are inapposite because those plaintiffs were non-Medicare beneficiaries. *See, e.g., Brockovich v. Community Med. Ctrs., Inc.,* 2007 WL 738691 (E.D. Cal. March 7, 2007). Ivens characterizes Guidant's standing argument as a frontal assault on the MSP's private right of action that should be addressed legislatively, not in a motion to dismiss.

Ivens concedes that she lacks traditional Article III standing to bring claims based on her own injuries. She acknowledges that she suffered no economic injuries because Medicare paid for the implanting and explanting of her ICDs. However, she contends that the MSP gives her standing by partially assigning the Government's claims to her in

8

§ 1367(y)(3)(A). She analogizes this to a grant under the FCA for a *qui tam* action. But a comparison of the two statutes reveals their differences, not their similarities.

A *qui tam* action is "an action under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive." *Blacks' Law Dictionary* 1262 (8th ed. 2004). Under the FCA, a private person, known as a relator, may bring a *qui tam* civil action "in the name of the Government," 31 U.S.C. § 3730(b)(1), against "[a]ny person who "knowingly presents . . . to . . . the United States Government . . . a false or fraudulent claim for payment." 31 U.S.C. § 3729(a). The relator receives a share of the proceeds from the action, sometimes referred to as a bounty. 31 U.S.C. § 3730(d). The FCA contains specific procedural mechanisms that a relator must use in order to assert a claim under the FCA, including, but not limited to, service of the complaint on the Government before service on the defendant, the Government's participation in settlement, and consent of the Government before a case can be dismissed. *See generally* 31 U.S.C. § 3730(b)-(f).

The United States Supreme Court has held that a relator under the FCA has Article III standing because he or she has a "concrete private interest in the outcome of [the] suit" by virtue of the relator's right to a portion of the recovery. *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). In reaching this conclusion, the Supreme Court explained that the "adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor," *id.*, and that a relator under the FCA is "suing as a *partial* assignee of the United States," *id*. at 774 n.4 (emphasis in original).

Congress cannot manufacture Article III standing for a plaintiff who otherwise has no injury simply by providing a private right-of-action in a law. *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing"). Instead, the right to proceed *qui tam* arises only by affirmative statutory authorization, and in the absence of some unambiguous authorization, a purposed *qui tam* relator may not so proceed. *See United States ex rel. Mattson v. Northwest Paper Co.*, 327 F. Supp. 87, 93 (D. Minn. 1971).

Unlike the FCA, the MSP does not unambiguously indicate that Congress, expressly or by implication, assigned any individual the right to bring suit on behalf of all Medicare beneficiaries. Moreover, the statute contains none of the procedural protections that are explicitly defined in the FCA, even though Congress added the private cause of action to the MSP the same month that Congress amended the FCA, which specifically allows *qui tam* actions. Without an unambiguous grant of authorization to sue, the United States as the real party in interest, or other procedural safeguards, the MSP does not share common characteristics of the FCA. *See, e.g., Stalley v. Genesis Healthcare Corp.*, 2007 WL 781907 at * 3 (E.D. Pa. March 12, 2007) (discussing differences between *qui tam* actions under the FCA and a private right of action under the MSP); *Stalley v. Sumner Reg'l Health Sys., Inc.*, 2007 WL 173686 at * 6 (M.D. Tenn. Jan. 18, 2007) (same).

Assuming all facts in the Master Complaint to be true and construing all reasonable inferences from those facts in the light most favorable to Ivens, she cannot show that the MSP grants her standing as an assignee of the United States to bring her MSP claims. Therefore, the Court must dismiss those claims for lack of subject matter jurisdiction.[3]

### B.   TPP Claims

#### 1.   UFCW Fund and the City's Claims

The TPP Claims contained in the Master Complaint are alleged by two named TPPs, Plaintiff UFCW Local 1776 and Participating Employers Health and Welfare Fund (the "UFCW Fund") and Plaintiff City of Bethlehem (the "City"). (Master Compl. ¶¶ 27-28.) Both are residents of Pennsylvania. (*Id*.) The UFCW Fund is a not-for-profit trust established to provide comprehensive health care benefits to participant workers,

---

[3] Although Ivens does not have standing to pursue her MSP claims, the Court will briefly address Guidant's second basis for its 12(b)(6) motion. Assuming, without deciding, that Guidant is a "primary plan," Guidant asserts that Ivens cannot bring her MSP claims until Guidant's responsibility to pay for health care expenses is established. Relying on portions of the Medicare Secondary Payer Manual concerning subrogation rights, Ivens responds that she does not need to demonstrate responsibility prior to alleging her claims because her MSP claims are based on the Government's direct right to action, which does not require determination of responsibility prior to the commencement of an action. *See* 42 U.S.C. § 1395y(b)(2)(B)(iii) (explaining that the United States may bring an action "against any or all entities that are or were required" to make a payment under a primary plan). The United States Court of Appeals for the Eleventh Circuit recently addressed this exact issue. *See Glover v. Liggett Group, Inc.*, 459 F.3d 1304 (11th Cir. 2006). In that case, the Eleventh Circuit affirmed the district court's determination that § 1395y(b)(3)(A) supports no private cause of action against an alleged tortfeasor where a defendant's responsibility to pay for health care expenses of a Medicare beneficiary has not already been established. This Court finds that reasoning persuasive and adopts it as its own. For that reason, if Ivens had standing, her MSP claims would nonetheless fail because Guidant's responsibility to reimburse Medicare has not yet been determined.

11

and it alleges that it has "paid all or part of the cost of its participants' purchases and associated medical expenses of the Guidant products at issue in this litigation, including the medical expenses for the subrogee, John Doe." (*Id*. at ¶ 27.)   The UFCW Fund asserts that it has standing to bring claims in its own name pursuant to 29 U.S.C. § 1132(d) of the Employment Retirement Income Security Act and that it has been injured by Guidant's alleged misconduct.  (*Id*.)  The City, a self-insurer, provides medical benefits to its eligible employees by means of a contract, policy or plan.  (*Id*. at ¶ 28).  It alleges that it "has been billed for and has paid charges for Guidant devices at issue in this litigation" and "has incurred and is likely to incur . . . full or policy partial costs for the Guidant products at issue in this litigation and related medical costs."  (*Id*.)

Pursuant to Federal Rule of Civil Procedure 23, the UFCW Fund and the City bring their TPP claims on behalf of themselves and all others similarly situated:

> [A]ll third party payors . . . in the United States (or its Territories) who (i) have been issuers or sponsors of a contract, policy or plan that provides medical coverage to natural persons, and (ii) have incurred, pursuant to such contract, policy, or plan, full or partial costs of any of the [pacemakers and ICDs] and related medical costs including implantation surgery, replacement surgery, medical monitoring and/or hospital costs.

(*Id*. at ¶ 254.)  They assert that for the purposes of the TPP class definition, "third party entities 'purchased' the Guidant Devices if they paid some or the entire purchase price." (*Id*.)  In addition, they assert that as a direct and proximate cause of Guidant's conduct, "[p]ublic and private payors of health insurance have had to shoulder, wrongfully, an enormous economic impact of Guidant's conduct, [in] an amount that is in the hundreds of millions of dollars." (*Id*. at ¶ 9.)

12

The TPP Plaintiffs seek "non-monetary relief including disclosure . . . of registrant list(s) maintained by Guidant to enable appropriate effectuation of the recall and the proper allocation of the economic burden of that recall" and "monetary relief including payment for the wrongful burden placed on TPPs for the costs of replacement and/or corrective surgeries. " (*Id*. at ¶ 29).   They allege nine counts against Guidant: (1) Violation of the Minnesota Deceptive Trade Practice Act; (2) Violation of the Minnesota Prevention of Consumer Fraud Act; (3) Violation of Minnesota False Statements in Advertising Statute; (4) Unfair and Deceptive Trade Practices Under State Law; (5) Subrogation Liability Determination; (6) Unjust Enrichment; (7) Breach of Implied Warranty; (8) Breach of Assumed Contractual Warranty Obligations; and (9) Misrepresentation by Omission.

### 2. The TPP's Standing to Assert Their Claims

Guidant asserts that the named TPP Plaintiffs do not have Article III standing to assert seven of their claims, specifically those involving state consumer protection statutes, warranties, and misrepresentation by omission.[4]  Specifically, Guidant asserts that the named TPP Plaintiffs have suffered no injuries-in-fact because their insureds, not the TPPs, are the persons who suffered injuries, if any.  It also contends that there is no causal connection between the alleged injury and Guidant's conduct because the devices at issue in this litigation are only available through a doctor.

---

[4]    The fact that the named TPP Plaintiffs seek to bring claims on behalf of a class adds nothing to the question of standing because named plaintiffs who want to represent a class must show that they were personally injured by a defendant's actions before seeking relief for themselves or on behalf of others. *See Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 40, n.20 (1976); *Warth*, 422 U.S. at 502.

The TPP Plaintiffs respond to Guidant's argument in four sentences, asserting baldly that the they have suffered a "direct injury" because they had incurred "economic injuries by paying wholly unnecessary cost and medical expenses directly attributable and allocable to that conduct." (Plfs' Opp'n at 9). In their briefs and at oral argument, both Guidant and the TPP Plaintiffs downplayed the importance of the federal standing requirements and instead concentrated on whether Minnesota and Pennsylvania law applies to the TPP's claims and whether the named TPP Plaintiffs have standing under either state's consumer protection statutes and common law.

Standing under state law is not equivalent to standing under federal law. Rather, regardless of a plaintiff's ability to sue in state court, a plaintiff in a federal court must meet federal standing requirements in order to assert a claim in federal court. *See Metropolitan Express Servs., Inc. v. City of Kansas City*, 23 F.3d 1367, 1369 (8th Cir. 1994) (recognizing that a court sitting in diversity may not address a plaintiff's claim until the plaintiff has standing to sue under Article III and state law); *Group Health Plan, Inc. v. Philip Morris Inc.*, 86 F. Supp. 2d 912, 917 n.2 (D. Minn. 2000) (explaining that Article III standing requirements are a "wholly separate determination" from state standing). Therefore,

> in determining jurisdiction, district courts of the United States must look to the sources of their power, [A]rticle III of the United States Constitution and Congressional statutory grants of jurisdiction, not to the acts of state legislatures. However extensive their power to create and define substantive rights, the states have no power directly to enlarge or contract federal jurisdiction.

*Duchek v. Jacobi*, 646 F.2d 415, 419 (9th Cir. 1981). In this way, the requirement that a

plaintiff must have suffered "a distinct and palpable injury to himself" remains, independent of any statute. *Warth,* 422 U.S. at 501.

Assuming all facts in the Master Complaint to be true and construing all reasonable inferences from those facts in the light most favorable to the named TPP Plaintiffs, the Court concludes that they do not have Article III standing to assert seven of their claims.[5] The named TPP Plaintiffs assert, in conclusory fashion, that they are purchasers that suffered direct injuries. But a court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Wiles*, 280 F.3d at 870. The named TPP Plaintiffs provide no support for their assertion that they are purchasers. There are no allegations in the Master Complaint that the TPPs agreed to pay for the devices at issue and related costs based on their relationship with Guidant or representations Guidant made to it. There is no allegation that the named TPP Plaintiffs had any role in selecting which devices a patient should receive. And there are no allegations that the named TPP Plaintiffs agreed to pay a certain price for the devices based on Guidant's statements or to grant Guidant some sort of preferred or approved provider status, thereby creating a direct relationship between the named TPP Plaintiffs and Guidant. In fact, the named TPP Plaintiffs concede that they were contractually bound to pay for their insureds' medical expenses related to the recalled devices and that Guidant has a relationship with

---

[5] In reaching this conclusion, the Court acknowledges that its colleague in the Medtronic MDL recently denied a motion by the defendant to dismiss the third-party payer claims in that MDL on the basis of standing. This decision today was reached on the record before the Court in this MDL, looking only to the allegations in the Master Complaint.

the doctors and patients, not with the TPP Plaintiffs.

In this way, the named TPP Plaintiffs' claims are distinguishable from drug cases in which a third-party payer has standing because it suffered direct injuries related to its agreement to buy drugs at a high price when cheaper alternatives were available. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004) ("Notably, TPPs, like individual consumers, suffered direct economic harm when, as a result of [Defendant's] alleged misrepresentations, they paid supracompetitive prices for Coumadin instead of purchasing lower-priced generic warfarin sodium"); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 349 (2d Cir. 2003) (explaining that third-party payers' injuries were direct because they were unaffected by whether any patient was harmed by the drug when, but for defendants' misrepresentations, third-party payers would not have bought cheaper alternatives, not defendants' drug). And the claims are distinguishable from the antitrust cases in which a third-party payer alleges a direct injury based on money paid directly as a result of a defendant's anticompetitive conduct. *See, e.g., Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir. 1995) (concluding plaintiff had standing to sue because it had made payments directly to the defendant based on alleged overcharges billed by defendant).

Moreover, there is no causal connection between the alleged injury and Guidant's alleged misconduct. Standing requires a causal connection between the injury and the conduct complained of, specifically, the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. *Lujan*, 504 U.S. at 560. In *Rivera v. Wyeth-Ayerst Lab.*, 283

16

F.3d 315 (5th Cir. 2002), the court found that a plaintiff had not established a causal connection between her taking a drug prescribed by a doctor and her alleged injuries because the causation link would depend on concluding that had the defendant acted lawfully, the doctor would not have prescribed the drug and the patient would not have taken it. *Rivera*, 283 F.3d at 320. The court concluded such causation was too speculative. *Id*. The Court finds *Rivera* persuasive.

Here, the named TPP Plaintiffs' purported standing rests on the independent choices of the doctors who recommend the devices to their patients and on the patients who decide to receive the devices, in lieu of other treatment options, if any. In essence, the TPP Plaintiffs allege that Guidant committed a tort on their insureds, causing injury and resulting in the injureds seeking medical treatment, which in turn caused economic harm to the TPPs because they were contractually obligated to pay for the injureds' medical care. Without a more direct connection, these claims are too speculative to establish a causal link between the alleged injury and the alleged misconduct.

Given that the Court has concluded that the named TPP Plaintiffs lack standing to assert their claims involving state consumer protection statutes, warranties, and misrepresentation by omission, it must dismiss those claims for lack of subject matter jurisdiction.[6]

---

[6] If the TPP Plaintiffs had standing, their claims would nonetheless fail because they are premature. Standing and ripeness are related, but separate, doctrines that each focuses on whether the harm asserted has matured sufficiently to warrant judicial intervention. *Warth*, 422 U.S. at 499 n.10. Ripeness is intended to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements. *Neb. Pub. Power Dist. v. MidAm. Energy Co.*, 234 F.3d 1032, 1037 (8th

**II.     Failure to State a Claim**

Guidant moves to dismiss the TPP Plaintiffs' remaining claims for failure to state a claim upon which relief can be granted. The Court briefly considers each in turn using the standard of review discussed above.

   **A.     Subrogation Liability Determination**

In a claim entitled "Subrogation Liability Determination," the TPP Plaintiffs seek relief that they characterize as injunctive relief and that Guidant characterizes as a discovery request. (Master Compl. ¶¶ 412-418.) In essence, the claim seeks a list of Guidant's records so that the TPPs may identify which of their insureds received a recalled Guidant pacemaker or ICDs so that they can seek monetary relief based on their contractual subrogation rights. (*Id.*) Guidant does not dispute the existence of the TPP Plaintiffs' right in theory to subrogation. It does, however, contest the manner in which the TPP Plaintiffs have alleged their claim.

The TPP Plaintiffs do not name any insureds, allege that any of their insureds have alleged claims against Guidant, or that any of their insureds have been paid any money by Guidant. Under either Pennsylvania or Minnesota law[7] and in the absence of such allegations, especially from whom the subrogation rights are derived, the subrogation claims fails to state a claim upon which relief can be granted. *See, e.g., Topelski v. Universal South Side Autos, Ins.,* 180 A.2d 414, 421 (Pa. 1962) (explaining proper

Cir. 2000). Each of the TPP claims depends on whether Guidant committed some wrong against the TPP's participants. Until that issue is decided, the TPP Plaintiffs' claims cannot be ripe.

[7]     There is no need to perform a choice of law analysis at this stage of the proceedings.

manner in which to allege a subrogation claim); *Westendorf v. Stasson*, 330 N.W.2d 699, 703 (Minn. 1983) (discussing "made whole" doctrine).  Therefore, the Court must dismiss the subrogation count under Rule 12(b)(6).

### B.     Unjust Enrichment

The TPP Plaintiffs allege that they conferred a benefit upon Guidant by paying for the devices at issue on their insureds' behalf, that Guidant knew and accepted these payments, and that Guidant's retention of these payments would be inequitable.  (Master Compl. ¶¶ 423-427.)  Because the TPP Plaintiffs have an adequate remedy of law through a properly pled subrogation claim, their claim for unjust enrichment fails under Minnesota law.  *See Group Health Plan, Inc. v. Philip Morris, Inc.*, 68 F. Supp. 2d 1064, 1070-71 (D. Minn. 1999); *reaffirmed on remand by Group Health Plan,* 86 F. Supp. 2d at 916.  In addition, because the TPP Plaintiffs' claims are too remote, their unjust enrichment claim fails under Pennsylvania law.  *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 937 (3d Cir. 1999).  Therefore, the Court must dismiss the unjust enrichment claim under Rule 12(b)(6).

### CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1. Guidant's Motion to Dismiss the Medicare Secondary Payer and Third-Party Payer Claims (Doc. No. 396) is **GRANTED.**

2. Counts XVIII- XXI and XXIII-XXX contained in the Amended Master

Complaint[8] are **DISMISSED WITH PREJUDICE**.

3. Count XXII contained in the Amended Master Complaint is **DISMISSED WITHOUT PREJUDICE.**

3. Because it appears that Guidant is no longer pursuing its Motion to Dismiss the Master Complaint Claims of the Individual Device Recipient Plaintiffs (Doc. No. 392), it is directed to withdraw that motion immediately and file an answer to the remaining portions of the Amended Master Complaint no later than 10 days after the date of this Order.

Dated: April 16, 2007         s/Donovan W. Frank
                              DONOVAN W. FRANK
                              Judge of United States District Court

---

[8] The Master Complaint was amended on February 21, 2007, to add a claim for punitive damages. (Doc. No. 1195).