## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:  GUIDANT CORP. IMPLANTABLE DEFIBRILLATORS PRODUCTS LIABILITY LITIGATION | MDL No. 05-1708 (DWF/AJB) |
| This Document Relates to All Actions | **MEMORANDUM OPINION AND AMENDED ORDER REGARDING DETERMINATION OF THE COMMON BENEFIT ATTORNEY FEE AMOUNT AND REASONABLE ASSESSMENT OF ATTORNEY FEES** |

This matter is before the Court on the Plaintiffs' Steering Committee's Request

Pursuant to Section II.K of the Master Settlement Agreement for a Determination of the

Common Benefit Attorney Fee Amount ("the PSC's request").[1]  Four separate groups of

Plaintiff attorneys submitted written objections to the Plaintiffs' Steering Committee's

("PSC") Request.[2]  Oral argument was heard on January 23, 2008.  On February 15,

---

[1]      Although "the PSC's request" was signed by only the four members of the LCC, and although some of the PSC members joined in an opposition filed to the request, the Court refers to the request as "the PSC's request" and refers to the assertions and arguments made therein as made by the PSC for the sake of consistency and simplicity throughout this Opinion.

[2]      The four separate submissions are:  (1) the Opposition by Certain PSC Members and other Attorneys and Firms with State and Federal Cases to the Request of the Plaintiffs' Lead Counsel Committee for Payment of Attorneys Fees and Costs Above the Court Approved Assessment Amount Set Forth in Pre Trial Order No. 6 ("the Opposition"); (2) the Texas State Court Plaintiffs' Objection to the Plaintiffs' Steering

(Footnote Continued on Next Page)

2008, the Court issued a Short Order granting in part and denying in part the PSC's request, indicating that a Memorandum Opinion and Order would follow.[3]  (MDL No. 05-1708 (DWF/AJB), Doc. No. 2603.)

Based upon the submissions of the parties, including the pleadings, records, and arguments of counsel, and for the reasons stated herein, the Court grants in part and denies in part the PSC's request and adheres to the Court's February 15, 2008 Order to the extent it is not inconsistent with this opinion and amends it as explained below.

---

(Footnote Continued From Previous Page)
Committee's Request Pursuant to Section II.K of the Master Settlement Agreement for a Determination of the Common Benefit Attorney Fee Amount ("the Texas Objection"); (3) Beasley, Allen, Crow, Methvin, Portis & Miles, PC's Objections to the Plaintiff's Steering Committee's Request Pursuant to Section II.K of the Master Settlement Agreement for a Determination of the Common Benefit Attorney Fee Amount ("the Beasley, Allen Objection"); and (4) the January 22, 2008 letter from Thomas J. Farmer to the LCC ("the Farmer Objection").  In addition, on February 8, 2008, Hissey Kientz, L.L.P. submitted an Objection to and Brief in Opposition to Plaintiffs' Steering Committee's Common Benefit Fee Request ("the Hissey Kientz Objection").  The Court finds the Hissey Kientz Objection untimely.  The Court notes, however, that even if the objection were timely, the arguments that Hissey Kientz set forth are either the same as those already put forth by other objectors, or meritless (*i.e.*, promissory estoppel, violation of ethics and fiduciary duties, violation of ABA Model Rules).

[3]     At the January 23, 2008 hearing, the Court offered to rule on the PSC's request via a Short Order within an expedited time period, with a Memorandum Opinion to follow, in order to allow for the settlement process to proceed pursuant to the Master Settlement Agreement.  All counsel present at the hearing agreed to proceed in this manner.

## BACKGROUND[4]

This multi-district litigation ("MDL") commenced in November 2005 when the Judicial Panel on Multidistrict Litigation consolidated certain actions and transferred them to the District of Minnesota for pre-trial proceedings against Defendants Guidant Corporation, Guidant Sales Corporation, and Cardiac Pacemakers, Inc. (collectively, "Guidant").  These actions were brought by individual Plaintiffs for injuries alleged to have been caused by certain defective implantable defibrillator devices and pacemakers manufactured by Guidant.

On December 19, 2005, and January 6, 2006, respectively, the Court designated four individuals to serve on the Plaintiffs' Lead Counsel Committee ("LCC") and 19 to serve on the Plaintiffs' Steering Committee ("PSC").[5]  At that time, the Court also

---

[4]     This Background section provides only a summary of some of the relevant occurrences throughout this litigation.  It in no way encompasses all of the decisions made, orders issued, or work completed in this MDL.

[5]     The Court designated the following individuals to serve on the LCC:  Richard Arsenault, Esq., of Neblett, Beard & Arsenault; Elizabeth Cabraser, Esq., of Lieff, Cabraser, Heimann & Bernstein, LLP; Seth R. Lesser, Esq., of Locks Law Firm, PLLC; and Charles S. Zimmerman, Esq., of Zimmerman Reed.  The Court also designated Mr. Zimmerman to serve as Plaintiffs' Liaison Counsel.

The Court designated the following individuals to serve on the PSC:  William M. Audet, Esq. of Alexander, Hawes & Audet, LLP; Daniel E. Becnel, Esq., of the Law Offices of Daniel E. Becnel, Jr.; John R. Climaco, Esq., of Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A.; C. Brooks Cutter, Esq., of Kershaw, Cutter & Ratinoff, LLP; Lance A. Harke, Esq. of Harke & Clasby LLP; Irwin B. Levin, Esq., of Cohen & Malad, LLP; Richard A. Lockridge, Esq., of Lockridge Grindal Nauen, PLLP; Ramon R. Lopez, Esq., of Lopez, Hodes, Restaino, Milman & Skikos; Tobias L. Millrood, Esq., of Schiffrin & Barroway, LLP; Stacey L. Mills, Esq., of Heins, Mills & Olson, PLC; Timothy M. O'Brien, Esq., of Levin Papantonio, Thomas, Mitchell, Echsner & Proctor,

(Footnote Continued on Next Page)

ordered the LCC to establish an electronic document repository, set forth the protocol for status conferences,[6] which included setting monthly status conferences starting in February 2006, and approved the Plaintiff's Fact Sheet.  Then, on January 31, 2006, the Court established a procedure to identify representative bellwhether cases to be tried[7] and the Court set the deadlines for discovery and early dispositive motions on those bellwhether cases.  The Court set the trial ready date for the expedited cases as March 15, 2007, and ordered Plaintiffs' Fact Sheets to be completed within 30 days.  The Court also ordered lead counsel for each party to confer with Magistrate Judge Arthur J. Boylan for the purpose of explaining their positions regarding early settlement efforts.

In PTO 6, dated February 15, 2006, the Court established a common benefit fund and set forth protocols to compensate and reimburse attorneys for services performed and

---

(Footnote Continued From Previous Page)
P.A.; Paul J. Pennock, Esq., of Weitz & Luxenberg, P.C.; Christopher A. Seeger, Esq., of Seeger Weiss LLP; Hunter J. Shkolnik, Esq., of Rheingold, Valet, Rheingold, Shkolnik & McCartney LLP; Thomas M. Sobol, Esq., of Hagens Berman Sobol Shapiro, LLP; Silvija A. Strikis, Esq., of Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC; Teresa Toriseva, Esq., of Hill Toriseva & Williams, PLLC; Sol Weiss, Esq., of Anapol, Schwartz, Weiss, Cohan, Felman and Smalley, PC; and Justin Witkin, Esq., of Aylstock, Witkin & Sasser, PLC.  On August 1, 2006, the Court appointed Nicholas J. Drakulich, Esq., of Jennings & Drakulich, LLP to the PSC, replacing John Climaco, Esq., who had resigned.

[6]     The Court set monthly status conferences commencing in February 2006.

[7]     Later, in Pretrial Order ("PTO") 8, dated March 23, 2006, the Court established a consultation and submission process regarding the selection of the representative bellwether cases consistent with the trial ready date of March 2007.  At this time, class certification was still an issue.

expenses incurred for MDL administration and otherwise for Plaintiffs' general benefit.

PTO 6 states, in part, as follows:

> All plaintiffs and their attorneys who either agree or have agreed to settle, compromise, dismiss, or reduce the amount of a claim or, with or without trial, recover a judgment for monetary damages or other monetary relief, including compensatory and punitive damages, with respect to any Guidant defibrillator and/or pacemaker claims are subject to an assessment of the "gross monetary recovery," as provided herein.

> . . . .

> . . . For all cases whose counsel have agreed within 90 days of this Order to cooperate with the MDL by signing an appropriate agreement . . . , the assessment in such cases shall be two percent (2%) as fees and two percent (2%) as costs (a total of four percent (4%)) of the "gross monetary recovery." . . . Two percent (2%) shall be deemed fees to be subtracted from the attorneys' fees portions of individual fee contracts, and two percent (2%) shall be deemed costs to be subtracted from the client portion of individual fee contracts. . . .

> . . . Following the 90-Day period in the preceding paragraph, any counsel who files for the first time a case involving a personal injury claim relating to Guidant defibrillator or pacemaker that becomes part of this MDL shall have 45 days from the date of initial filing of the claim to cooperate with the MDL by signing an appropriate agreement . . ., and the assessment in such cases shall be two percent (2%) as fees and two percent (2%) as costs (a total of four percent (4%)) of the "gross monetary recovery." . . . Two percent (2%) shall be deemed fees to be subtracted from the attorneys' fees portions of individual fee contracts, and two percent (2%) shall be deemed costs to be subtracted from the client portion of individual fee contracts.

> . . . .

> . . . Other than as identified in paragraph A(1)(f)(2)(a) above, following the initial 90-day period to permit counsel to consider the 90-Day Participation Option, Counsel who sign an appropriate agreement . . . shall be assessed on all Guidant defibrillator and/or pacemaker cases now pending, or later filed in, transferred to, or removed to, this court and treated as part of the coordinated proceeding known as *In re: Guidant Defibrillator Products Liability Litigation*, MDL No. 1708, as well as

unfiled or tolled cases, in the amount of the "gross monetary recovery" established and agreed to by the LCC. This amount shall exceed the 4% assessment under the full participation option. Such counsel shall also be assessed in the same amount of the "gross monetary recovery" such as shall be established by the LCC on any other cases filed in any state court, and on clients whose cases are as yet unfiled, or whose cases are later remanded to state court; unless these percentages are modified by agreement of counsel or by the Court upon showing of good cause.

(February 15, 2006 Order ("PTO 6").)

The attached Agreements (both the 90-day participation option and the post 90-day assessment option), which were incorporated into PTO 6 by reference, state as follows:

It is understood and agreed that the LCC, the PSC and Common Benefit Attorneys may also apply to the Court for class action attorneys' fees (including any multiplier) and reimbursement of expenses[/costs], if appropriate, and this Agreement is without prejudice to the amount of fees or[/and] costs to which the LCC, the PCS and Common Benefit Attorneys may be entitled to in such an event.

(PTO 6, Exhs. A and B.)

On May 26, 2006, the Court issued PTO 12, which acknowledged that the parties had submitted an agreed upon Complaint by Adoption form, and ordered that any individual could use the Complaint by Adoption form to adopt relevant portions of the Master Consolidated Complaint. And on July 24, 2006, later amended by an Order dated November 17, 2006, the Court issued PTO 15, which established the protocol for discovery and testing of Plaintiffs' devices in their possession.

On November 28, 2006, in PTO 25, the Court set forth a scheduling order[8] for the first bellwether case and amended the trial-ready dates for all of the bellwether cases. The trial start dates were later amended again on March 18, 2007, as follows:  (1) the bellwether trial for Leopoldo Duron, Jr. (explant without complications) was set to start on July 30, 2007; (2) the bellwether trial for Eugene Clasby (explant with complications) was set to start on August 27, 2007; (3) the bellwhether trial for Leland Braund (explant without complications) was set to start on September 24, 2007; (4) the bellwether trial for Stanley Beranek (non explant/psychological injury) was set to start on October 22, 2007; and (5) the bellwhether trial for Joyce Valls (non-explant/psychological injury) was set to start on November 27, 2007.

In a March 27, 2007 letter, the Court established a procedure for dealing with time-sensitive issues whereby the parties were allowed to file letter briefs and oppositions on a weekly basis.  The Court then agreed to conduct Tuesday morning on-the-record telephone conference calls to rule on the issues raised in the letter briefs.  Then, after months of discovery, motion to dismiss briefing, argument, and rulings, summary judgment briefing, argument, and rulings,[9] *Daubert* briefing, argument, and rulings,[10]

---

[8]    The Court modified the schedule in its February 20, and March 19, 2007 Orders. The Court issued scheduling orders for the remaining bellwhether cases in PTO 31, dated April 2, 2007.

[9]    The parties filed and argued, and the Court issued Orders on ten summary judgment motions.  The motions for summary judgment were (1) Plaintiffs' Motion for Partial Summary Judgment on Defendants' Claims Related to the VENTAK PRIZM 2 DR Model 1861 Based on Federal Preemption; (2) Guidant's Motion for Summary Judgment on Plaintiff's Claims Based on Federal Preemption; (3) Guidant's Motion for
(Footnote Continued on Next Page)

pre-trial preparation, motion *in limine* briefing, briefing resulting in a multitude of other

pre-trial orders, and months of negotiations adroitly overseen by Magistrate Judge Boylan

and Special Master Pat Juneau, the parties entered into a proposed settlement on July 12,

2007.  As a result, a term sheet was signed.  The total settlement fund negotiated was

$195,000,000.00, and that amount included payment for both claimants' recoveries and

common benefit attorney fees.

Within the next month, and after more Settlement Consideration Forms than

anticipated were submitted, the parties commenced a renegotiation process with the

assistance of Magistrate Judge Boylan and Special Master Juneau.  The settlement

renegotiation lasted approximately four months.  The renegotiation contemplated a global

settlement covering Plaintiffs from both the MDL and state cases, and included Plaintiffs

whose cases had been filed or transferred to the MDL, Plaintiffs whose cases were filed

outside the MDL in state court proceedings, and potential Plaintiffs who had not yet filed

---

(Footnote Continued From Previous Page)
Summary Judgment Based on Lack of Injury Caused by Malfunction; (4) Guidant's
Motion for Summary Judgment on Plaintiff's Punitive Damage Claim; (5) Guidant's
Motion for Summary Judgment on Plaintiff's Unjust Enrichment Claim; (6) Guidant's
Motion for Summary Judgment on Plaintiff's Cause of Action for Strict Product
Liability; (7) Guidant's Motion for Summary Judgment Based on Lack of Breach of
Warranties; (8) Guidant's Motion for Summary Judgment on Plaintiff's Claims
Regarding Intentional and Negligent Infliction of Emotional Distress; (9) Guidant's
motion for Summary Judgment on Plaintiff's Claims Regarding Unfair and Deceptive
Trade Practices; and (10) Guidant's Motion for Summary Judgment on Plaintiff
Leopoldo Duron, Jr.'s Failure-to-Warn Claims Based on the Learned Intermediary
Doctrine.  The Court also ruled on Plaintiff Duron's Motion for Application of Minnesota
law.

[10]     The Court ruled on all *Daubert* issues in both the *Duron* and *Clasby* cases, which
included 32 separate issues.

their cases.  This renegotiation process resulted in a new term sheet, whereby the total

settlement fund was increased to $240,000,000.00.  As before, the total settlement fund

included payment for claimants' recoveries and the common benefit attorney fees.  On

December 10, 2007, a Confidential Master Settlement Agreement ("MSA") was signed

by the MDL parties and by several attorneys who had represented Plaintiffs in state court

proceedings.[11]

    The MSA included a provision, section II.K., stating that the Court would

determine the amount of the Common Benefit Payment.[12]  The PSC asserts that because

of this provision in the MSA, they waive any separate fee assessment against the amount

paid to individual Plaintiffs as set forth in PTO 6.  In the request currently before the

Court, the PSC requests $45,250,000.00[13] of the $240,000,000.00 for common benefit

---

[11]    The Court notes that after the MSA was signed, a claims administrator was
appointed, and the claims administration process will continue its progression toward
distribution upon the issuance of this Order.

[12]    MSA Section II.K provides:

> **Common Benefit Payment.**  The Settlement Fund includes an amount for
> a requested common benefit payment to Claimants' counsel who would be
> entitled to such payment.  The amount of such common benefit payment
> shall be determined by MDL Judge Donovan Frank.  The LCC shall submit
> the request for common benefit payment.  Guidant shall have no additional
> financial obligation under the Settlement beyond the amount required by
> Section II.E.

[13]    The PSC represents that it would subtract $3,500,000.00 off the originally
requested $48,750,000.00 for advanced out-of-pocket costs and expenses.  Therefore, the
PSC's request for common benefit fees at the time of briefing is $45,250,000.00, which is
18.85% of the $240,000,000.00 settlement fund.

fees and asserts that it had "communicated [this] to all involved in the negotiations."

(The PSC's Request 6.)

## DISCUSSION

### I.     Common Cost Fund

"Counsel in common fund cases may recover those expenses that would normally be charged to a fee paying client." *In re Infospace, Inc.*, 330 F. Supp. 2d 1203, 1216 (W.D. Wash. 2004) (quotation omitted).  Here, the PSC requests reimbursement for their litigation costs from the client fund portion of the Settlement Fund.  The LCC provided the Court with cost estimates for the key cost categories.  These estimates included expenses incurred to date and projected expenses to be incurred during the winding up of the settlement.

Based on these estimates, the Court orders that $10,000,000.00 of the $240,000,000.00 Settlement Fund is set aside for common costs.  Such common costs include but are not limited to settlement administration costs (including the cost for the claims administrator), fees for the Garretson Firm's negotiation of Medicare/Medicaid lien resolution, Special Master fees, and $3,500,000.00 for reimbursement of advanced common benefit costs.  This $10,000,000.00 set-aside shall be referred to as "the Common Cost Fund."  Any amount from the Common Cost Fund remaining after all common costs have been paid shall be distributed to the claimants on a pro rata basis.

### II.    Common Benefit Attorney Fee Fund

An award of attorney fees is committed to the sound discretion of the district court.  *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999); *see*

*also* Fed. R. Civ. P. 23(h). However, "the district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 730 (3d Cir. 2001) (quoting *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328-29 (9th Cir. 1999)).

Under the "American rule," each litigant pays his or her own attorneys' fees. *See, e.g., Alyeska Pipeline Serv. Co., v. Wilderness Soc'y*, 421 U.S. 240, 245 (1975). There are exceptions, however, to this rule. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991). "For example, when a court consolidates a large number of cases, stony adherence to the American rule invites a serious free-rider problem. . . . If a court hews woodenly to the American rule under such circumstances, each attorney, rather than toiling for the common good and bearing the cost alone, will have an incentive to rely on others to do the needed work, letting those others bear all the costs of attaining the parties' congruent goals." *In re Nineteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 606 (1st Cir. 1992) (citation omitted); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[P]ersons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. . . . Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorneys' fees against the entire fund, thus spreading fees proportionately among those benefited by the suit."); *Hall v. Cole*, 412 U.S. 1, 5-6 (1973) (stating that one exception to the American rule

"involves cases in which the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them'") (quoting *Mills v. Elec. Auto-Lite*, 396 U.S. 375, 393-94 (1970)).  Therefore, a court supervising mass tort litigation is allowed to "intervene to prevent or minimize an incipient free-rider problem" and may use "measures reasonably calculated to avoid unjust enrichment of persons who benefit from a lawsuit without shouldering its costs." *In re Nineteen Appeals*, 982 F.2d at 606 (quotations omitted); *Hall*, 412 U.S. at 5-6 ("To allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense.") (quotations omitted).

Further, "[i]t is now commonly accepted in complex multiparty litigation that a court can and in fact should appoint a committee such as the [PSC and LCC] to coordinate the litigation and ease the administrative burden on the court." *In re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, MDL No. 1203, Civ. No. 99-20593, 2002 WL 32154197, at *17 (E.D. Pa. Oct. 3, 2002).  In addition, responsible case management requires such an appointment to promote efficiencies and to maximize the economies of scale.  "As a corollary to this appointment, the court must be permitted to compensate fairly the attorneys who serve on such a committee." *Id.*  (citing *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 773-74 (9th Cir. 1977); *In re Air Crash Disaster at Florida Everglades*,

549 F.2d 1006, 1014-15 (5th Cir. 1977)).  "[I]f lead counsel are to be an effective

tool the court must have means at its disposal to order appropriate compensation

for them.  The court's power is illusory if it is dependent upon lead counsel's

performing the duties desired of them for no additional compensation."  *Id.* at

1016.

One measure used by courts (and parties) to avoid unjust enrichment of

persons who benefit from a lawsuit without shouldering its costs, and to fairly

compensate those attorneys who coordinate the litigation and shoulder the heaviest

burden, is to create a common fund from which attorney fees will be paid for those

who worked for the common benefit of all plaintiffs.  *See Bowing*, 444 U.S. at 478

("[T]his Court has recognized consistently that a litigant or a lawyer who recovers

a common fund for the benefit of persons other than himself or his client is entitled

to a reasonable attorney's fee from the fund as a whole.")  The court's authority to

award attorney fees through an application of a common fund, rather than applying

the American rule, is derived from its traditional power to do equity.  *See id.* ("The

common-fund doctrine reflects the traditional practice in courts of equity, . . . and it

stands as a well-recognized exception to the general principle that requires every

litigant to bear his own attorney's fees.") (citation omitted); *Sprague v. Ticonic

Nat'l Bank*, 307 U.S. 161, 166 (1939) (stating that the common benefit doctrine is

an application of a court's "original authority . . . to do equity in a particular

situation").  The use of a common fund (rather than a straight assessment approach,

for example) is not limited to class action cases.  *See Sprague*, 307 U.S. at 166-67

("[W]hen such a fund is for all practical purposes created for the benefit of others,
the formalities of the litigation – the absence of an avowed class suit or the creation
of a fund, as it were, through stare decisis rather than through a decree – hardly
touch the power of equity in doing justice as between a party and the beneficiaries
of his litigation."); Federal Judicial Center, *Awarding Attorneys' Fees and
Managing Fee Litigation*, at 60 (2d ed. 2005) (stating that "the common fund
doctrine is not limited to class actions").

There are two primary methods for determining a common fund fee award:
the percentage-of-fund method and the lodestar method. *In re Cendant Corp.*, 243
F.3d at 732. Whichever method is used, "any given attorney should receive neither
too little nor too much of an award as compensation for the common benefit he
conferred upon the class as a whole." *In re Sulzer Hip Prosthesis and Knee
Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 922 (N.D. Ohio 2003).

Generally, the percentage-of-fund method is used in common fund cases. *In
re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 333 (3d Cir.
1998). This method involves a routine calculation of fees that is based on a
percentage of the common fund recovered. *See Blum v. Stenson*, 465 U.S. 886, 900
n.16 (1984); *see also In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir.
2002). It is "well established" in the Eighth Circuit that courts may utilize the
percentage-of-fund method when awarding attorney fees from a common fund.
*Petrovic*, 200 F.3d at 1157. Ultimately, a court's "award of attorneys' fees in

common fund cases need only be 'reasonable under the circumstances.'" *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 779 (6th Cir. 1996).

The lodestar method, on the other hand, involves the calculation of "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986); *see also Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 244 (8th Cir. 1996). This sum may then be "adjusted, up or down, to reflect the individualized characteristics of a given action." *Johnston*, 83 F.3d at 244.

Before this Court is a coordinated litigation of many individual yet related cases that effectively is, and proceeded as, a quasi-class action. Here, the Court will exercise its discretion to utilize both the percentage-of-fund method and the lodestar method, each cross-checking the other, to ensure that each attorney who is awarded a common benefit fee receives a reasonable fee in light of all the relevant circumstances unique to this case. *See id.* at 246 (stating that the district court had discretion to apply either the lodestar or percentage method).

### A.      Percentage Method

Utilizing the percentage method, the PSC requests a common benefit fee award of $45,250,000.00, which represents 18.85% of the $240,000,000.00 settlement fund.[14] The PSC asserts that this request is reasonable, taking into

---

[14]      The Court refers to those attorneys who are requesting common benefits fees as "common benefit attorneys."

consideration that it is below the range that courts have routinely approved for common fund cases with similar settlement fund amounts.

First, the Court notes its distaste for the establishment of a 25% benchmark as the starting basis for an award of attorney fees in common fund cases. The Court finds that a 25% benchmark would be completely arbitrary and would not take into consideration the varying circumstances and contours of every case. Further, the Court does not agree that strictly looking to other cases with similar settlement amounts will result in reaching a reasonable percentage for a particular case. That approach would not take into account the work actually completed for the benefit of the plaintiffs nor would it take into account what is most fair to the plaintiffs in light of the specific circumstances of the particular case in question.

The Court acknowledges and takes very seriously the notion that "the percentage method imposes a fiduciary responsibility on the court when awarding attorney fees because often persons with small individual stakes will not file objections and the defendant who created the fund has little interest in how the fund is allocated between the class and class counsel." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 992 (D. Minn. 2005). Although "[t]he Eighth Circuit has not established factors that a district court should consider when calculating the reasonable percentage to award attorney fees in a common fund case," nor has it "established a 'benchmark' percentage that the court should presume to be reasonable in a common fund case," the Eighth Circuit has utilized the twelve-factor test from *Johnson v. Georgia Highway Express, Inc.*,

488 F.2d 714, 719-20 (5th Cir. 1974).  *In re Xcel Energy*, 364 F. Supp. 2d at 992,

993 n.7 (citing *In re U.S. Bancorp Litig.*, 291 F.3d at 1038).  Here, the Court will

do the same.

The *Johnson* factors are:  (1) the time and labor required; (2) the novelty and

difficulty of the questions; (3) the skill requisite to perform the legal service

properly; (4) the preclusion of other employment by the attorney due to acceptance

of the case; (5) the customary fee for similar work in the community; (6) whether

the fee is fixed or contingent; (7) time limitations imposed by the client or the

circumstances; (8) the amount involved and the results obtained; (9) the

experience, reputation, and ability of the attorneys; (10) the undesirability of the

case; (11) the nature and length of the professional relationship with the client; and

(12) awards in similar cases.  *Johnson*, 488 F.2d at 719-20.

Not all of the *Johnson* factors will apply in every case, and "the court has

wide discretion as to which factors to apply and the relative weight to assign to

each."  *In re Xcel Energy*, 364 F. Supp. 2d at 993.  Here, in determining the

percentage of the settlement fund to set-aside for common benefit attorney fees, the

Court analyzes several of the *Johnson* factors and other considerations to ensure

that the attorney fees are reasonable based on the unique nature of this MDL.

### i.       The time and labor required

The PSC asserts that the common benefit attorneys incurred 98,540.13 hours

to litigate and resolve this case.  In support, the PSC provides an eight-and-a-half

page summary of the tasks performed for the common benefit of all Plaintiffs.  (*See*

PSC's Request 23-31.)  At a minimum, the Court acknowledges that, through its involvement in the case, certain Plaintiffs' counsel did engage in extensive discovery on the Ventak Prizm 1861 (and presumably engaged in a substantial amount of discovery on the Contak Renewal 1 & 2 devices);[15] took and defended over 150 depositions; reviewed millions of pages of documents; briefed many motions—some involving complex and novel legal issues; appeared before the Court regularly—including at numerous in-chambers and telephone conferences where much was accomplished as to both administration of the case and the resolution of disputes between Guidant and the Plaintiffs; worked with several expert witnesses; and prepared for the bellwether trials.  In fact, one of the unique contours of this case is that five bellwether cases were selected for trial and had firm trial dates set.  In addition, an even smaller group of Plaintiffs' counsel worked extremely hard for several months to negotiate the present settlement.[16]

However, the Court notes that for some of the common benefit attorneys/firms, their claimed hours appear to be inflated and, given the Court's

---

[15]    The PSC asserts that it has conducted discovery, document review, and other work regarding the other devices-at-issue as well.  However, the Court notes that it is not aware of such work being conducted because issues regarding such work have not been put before the Court.  Further, at one of a number of pretrial conferences that occurred in preparation for the bellwether trials, members of the PSC/LCC suggested that a scheduling conference would be needed to set a discovery schedule for the next set of devices.  Therefore, the Court interpreted this to mean that a fairly significant amount of discovery on the other devices still remained to be done at the time of settlement.

[16]    The Court notes that none of the objectors contest that this work was completed.

knowledge of the MDL's procedural history, are likely hours, expended on behalf of their individual clients rather than for the common benefit of all Plaintiffs.  In addition, because of the numerous attorneys involved, the possibility for duplication of effort and proper utilization of time becomes an issue.  For example, the Court had numerous contacts with members of the PSC and LCC throughout the two years of this litigation, and the Court observed on several occasions that when two or three lawyers in a courtroom or conference would suffice, many others would be present (and many times would not contribute to the argument or discussion).[17]  Although the Court recognizes that but for certain Plaintiff's counsel who helped with discovery, dispositive motions, numerous pre-trial issues, and extensive negotiations, other Plaintiffs' counsel would have expended substantially more hours in each of their cases (as is exemplified by cases where such work and communications do not occur), this type of overlap of time among the committee members can and should be discounted to the extent that it did not promote efficiency or value for all or most Plaintiffs.

## ii.    The novelty and difficulty of the questions

This case presented several difficult legal questions, particularly at the summary judgment stage, including questions addressing preemption, choice of law, injury, and malfunction.  In addition, although Plaintiffs survived summary

---

[17]    The Court assumes that some of these attorneys have requested common benefit fees for this time nonetheless, however hopes that most have not.

judgment, the case still presented many difficult questions regarding proof and causation that would have borne themselves out at trial.

### iii.   The skill requisite to perform the legal service properly

Plaintiffs' counsel, including those members of the LCC, PSC, and counsel representing Plaintiffs inside and outside the MDL, have significant amounts of experience in mass tort litigation.  This experience benefited immensely the Court's ability to effectively and expeditiously move the case along, and more importantly, this experience benefited the individual Plaintiffs.  Because of the nature of this MDL, with the variants in the type of injuries presented, and the fact that fifty-four different devices were at issue, this litigation easily could have dragged on for many years.  Instead, through the hard work and skill of counsel, the case was able to be settled within approximately two years from the commencement of the case.  In fact, the very able and experienced Magistrate Judge Boylan, who was intricately involved in the settlement negotiations, has noted that the negotiations were some of the most complex that he has been involved in and has praised the professionalism, competence, and skill of counsel during the settlement process.  Magistrate Judge Boylan's observations are consistent with what this Court has observed throughout the case as well.  In addition, the Court also observes that while all counsel on both sides of the case zealously represented their clients at all times, they remained civil and respectful to each other and the Court throughout.  Had it not been for the skill of counsel, there may have been no settlement and no recovery for the Plaintiffs here at all.

Therefore, the fact that counsel brought this case to a fair and reasonable conclusion is a good indicator of counsel's skills.

### iv. The preclusion of other employment by the attorney due to acceptance of the case

Although it may be assumed to some extent that one or more attorneys were precluded from taking on other cases in light of the attorney's dedication to this MDL, to the Court's knowledge, no attorney has made this specific assertion. Therefore, based upon the record before the Court, this factor did not play a role in the Court's decision here.

### v. The customary fee for similar work in the community

As a general rule, a reasonable hourly rate is the prevailing market rate, that is, "the ordinary rate for similar work in the community where the case has been litigated." *Emery v. Hunt*, 272 F.3d 1042, 1048 (8th Cir. 2001). The Court can look to other cases, its own experience, the complexity and uniqueness of the case, and what is necessary to resolve a particular case when evaluating what is a customary fee for similar work. As is explained below in section II.B regarding the lodestar cross-check, the Court finds that maximum $400.00 hourly rates for attorneys, and a maximum $150.00 hourly rate for paralegals, are reasonable and customary rates to help determine the customary fee.

### vi. Whether the fee is fixed or contingent

Here, the individual fee arrangements between the attorneys and their clients contemplated contingent fees. These contingent fee arrangements ranged from

20% to 50% of the client's recovery.  Although "[a]ttorneys are entitled to be

rewarded for taking the risk of nonpayment, [] they are not entitled to a windfall."

*In re Infospace*, 330 F. Supp. 2d at 1212 n.13; *see also Hendrickson v. Branstad*,

934 F.2d 158, 162 (8th Cir. 1991) ("A reasonable fee is one that is 'adequate to

attract competent counsel, but . . . [that does] not produce windfalls to attorneys.'")

(quoting *Blum*, 465 U.S. at 897).   Therefore,

> [w]hether or not [a litigant] agreed to pay a fee and in what amount is not
> decisive. . . .  [H]e might agree to pay his lawyer a percentage contingent fee
> that would be greater than the fee the court might ultimately set.  Such
> arrangements should not determine the court's decision.  The criterion for
> the court is not what the parties agreed but what is reasonable.

*Johnson*, 488 F.2d at 718 (quoting *Clark v. Am. Marine Corp.*, 320 F. Supp. 709,

711 (E.D. La. 1970)).  As is explained below in section III regarding contingency

fees, the Court finds it reasonable to cap individual case contingency fees at 20%.

### vii.    Time limitations imposed by the client or the circumstances

Admittedly, the Court expected the parties to treat this MDL with top

priority.  The Court placed extremely high demands on the parties to comply with

realistic but aggressive timelines.  The parties were under extreme constraints

facing five bellwether trials in four months, with each bellwether trial to be ten

days.  At the time of the settlement, the first bellwether trial was essentially ready

to go, with motions *in limine* filed and under advisement.  The Court notes that the

attorneys involved were willing to adhere to the strict deadlines for all pre-trial

events, and did so efficiently while submitting high quality work addressing all issues.  This enabled the Court to make decisions in a timely manner.

### viii.    The amount involved and the results obtained

Through the extraordinary efforts of the common benefit attorneys who contributed their time and skills, and advanced money to fund this litigation, Plaintiffs' counsel achieved a global settlement of $240,000,000.00 for 8,550 Plaintiffs.   The Court notes that many of the individual cases likely are not strong stand-alone cases.  Therefore, the result obtained is especially significant for these Plaintiffs.  Further, this litigation was essentially resolved within twenty months from the commencement of the MDL.  This is especially unusual, considering not only the length of other product liability MDLs, but more importantly, considering the disparate injuries and the multitude of devices-at-issue in this litigation. Therefore, the results here saved most Plaintiffs significant time, effort, and money.

### ix.    The experience, reputation, and ability of the attorneys

In addition to what has already been stated above in section iii, the Court notes that most of the attorneys involved had extensive experience with complex litigation, including MDL and class action experience.  Also, the attorneys had superb case management experience that permitted them to efficiently handle this complex case.  In addition, many of the managing attorneys had the ability to combine their skills with experienced trial lawyers in a way that proved efficient and beneficial to all Plaintiffs as the bellwether trial dates approached.

23

### x.   The undesirability of the case

On the record before the Court, this was not a factor the Court considered.

### xi.   The nature and length of the professional relationship with the client

On the record before the Court, this was not a factor the Court considered.

### xii.   Awards in similar cases

The Court has reviewed cases from this district and other districts to determine what percentage of the fund would be reasonable to set aside for common benefit attorney fees.  The dilemma that the Court encountered is that there are no cases that address the particular issues that are presented by this quasi-class action MDL case.   Although many class action cases have awarded attorney fees between 25% and 35% of a common fund, other MDL cases that are not class actions awarded attorney fees based on a much lower assessment percentage.  *See, e.g., In re Xcel Energy*, 364 F. Supp. 2d at 998 (citing cases awarding fee percentages ranging from 30% to 36% of the total settlement fund); *In re Lucent Techs., Inc., Sec. Litig.*, 327 F. Supp. 2d 426, 441 (D. N.J. 2004) (citing cases awarding fee percentages ranging from 25% to 30% of the total settlement fund); *In re Diet Drugs*, 2002 WL 32154197, at *19 (E.D. Pa. Oct. 3, 2002) (imposing a 6% assessment in federal cases and 4% in state cases).

Here, the common benefit attorneys in this MDL were faced with the difficult task of litigating for the benefit of all MDL Plaintiffs, yet dealing with the complexity of having fifty-four different models of implantable cardioverter

defibrillators, pacemakers, and cardiac resynchronization therapy defibrillators.  In

addition, these devices were alleged to have defects that manifested themselves in

at least five different ways.  Then the common benefit attorneys were tasked with

negotiating settlement on behalf of Plaintiffs both inside and outside the MDL.  It

would be hard to contest that this MDL is anything but complex.  Given the above

circumstances, and the utilization of the bellwether process and the grueling

timeline, which the Court understood to serve the interests of all involved and

promoted early settlement, most prior MDL's and class actions are distinguishable

from this case.[18]

### xiii.    The reaction of plaintiffs

The Court may consider both the number and quality of objections when

determining how a class has reacted to an attorney fee request.  *See, e.g., DeBoer v.*

*Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995) ("The fact that only a

handful of class members objected to the settlement similarly weighs in [class

counsel's] favor."); *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166,

179 (E.D. Pa. 2000) (noting that six objectors were an "extremely limited"

number).  Here, the PSC provided notice to all Plaintiffs' attorneys regarding the

percentage the PSC would be requesting for common benefit funds.  After

---

[18]    The PSC admits that "this MDL is almost certainly unique in the history of mass tort multidistrict proceedings."  (PSC's Request 22.)

submitting the PSC's request to the Court, four timely objections were filed on

behalf of more than 4,000 Plaintiffs eligible to participate in the master settlement.

The general arguments asserted by the objectors are:  (1) the Court should

deny the PSC's request for a "common fund" and instead direct that all cases in the

MDL are subject to the 4% assessment set forth in PTO No. 6 for common benefit

fees; (2) the amount requested is "unprecedented" and "far exceeds" the common

benefit assessments that have been imposed in comparable MDLs; (3) the request

is improper because it confuses common benefit assessments with class action fee

awards; (4) the request is excessive because the work here only spanned eighteen

months, rather than several years; (5) the request is not adequately documented and

does not show a connection between the work performed by the LCC and the

benefits on the MDL plaintiffs; (6) the request is unfair in application by having the

common benefit assessment taken off the top of the claimants' entire settlement

fund; and (7) the LCC has not met its burden in showing that the State Court

Plaintiffs benefited from their work.  The Court addresses each argument briefly in

turn.

**(a)      PTO 6: 4% assessment**

Some of the Plaintiff objectors argue that PTO 6, dated February 6, 2006, limits

the amount of the common benefit fee to 4%, and that to impose a different common

benefit fee now would involve a "bait & switch."  The Court disagrees.  The Court

adopted PTO 6 early on to establish a mechanism for assessments at the outset of the

litigation.  However, PTO 6 was issued at a time when Plaintiff attorneys were still

contemplating class action status.  The Agreements incorporated into PTO 6 by reference

state:

> It is understood and agreed that the LCC, the PSC and Common Benefit
> Attorneys may also apply to the Court for class action attorneys' fees
> (including any multiplier) and reimbursement of expenses[/costs], if
> appropriate, and this Agreement is without prejudice to the amount of fees
> or[/and] costs to which the LCC, the PCS and Common Benefit Attorneys
> may be entitled to in such an event.

(PTO 6, Exhs. A and B.)  Although the Plaintiffs did not ultimately seek class

certification, the Court and Plaintiffs did contemplate additional common benefit

payments in the event of settlement.

In addition, at the time PTO 6 was issued, the 2% + 2% approach was intended to

cover the work product of pre-trial activities.  It did not contemplate the grueling

negotiation process to which certain Plaintiffs' attorneys contributed here, nor was it

intended to cover the time and costs attributed to the negotiation process.

Finally, the Opposition asserts that "[t]he LCC now seeks to unilaterally radically

modify the rules of this MDL after the game has ended."  (Opposition 4.)  The Court

disagrees with this statement.  The Opposition fails to acknowledge that a common

benefit payment from the Settlement Fund is expressly contemplated by the terms of the

MSA.  Thus, even if there was an agreement previously to utilize a straight assessment at

2% + 2%, the terms of the MSA contracted around it.[19]

---

[19]     The Court notes that, interestingly, some of the objectors who raised this argument
were also signatories to the MSA.  Therefore, the argument that the LCC was acting
unilaterally is utterly false.

### (b)   "Unprecedented" in light of comparable MDLs

The Opposition takes the strong position that the PSC has filed an "unprecedented motion" seeking a request that is "improper, excessive and contrary to well established law." (Opposition 1.) The Opposition and the Beasley Objection cite several cases where courts have imposed a single-digit assessment for federal and state cases. However, as stated above, the Opposition and the Beasley Objection fail to acknowledge the fact that the parties negotiated away from the assessment approach when they entered into the MSA. In addition, and also as explained above, most prior MDLs and class actions are distinguishable from this case.

### (c)   Common benefit assessments vs. class action fee awards

Contrary to the Opposition's assertion, just as common benefit assessments are used in a supplementary role to provide compensation to attorneys for work performed for plaintiffs' general benefit, so too is a common fund set-aside. Further, as mentioned above, this MDL essentially is a quasi-class action. Therefore, the line that the Opposition and other objectors attempt to draw between MDLs and class actions does not apply when the Court is determining the appropriateness of the amount for a common benefit set-aside here. In class actions, class counsel is typically responsible for performing all the work and individual plaintiffs are not separately represented by their own attorneys. Here, like in a class action, a group of counsel was responsible for performing most of

the work.  Even though most individual Plaintiffs had their own separate attorney as well, those attorneys will be compensated fairly for their individual case work through the contingent fee awards.

### (d)     Excessive when litigation only spanned eighteen months

The Court disagrees with the Opposition's devaluation of how quickly this MDL was resolved.  An attorney fee award should not penalize counsel for settling at an earlier stage of the litigation.  Certain attorneys put in significant effort and many hours with the Court and the Magistrate Judge in order to resolve these cases. Instead of decreasing the value of the common benefit attorneys' work, this instead shows that the common benefit attorneys' work was extremely valuable, especially in light of the advanced age of many of the Plaintiffs encompassed by the global settlement.  The common benefit attorneys saved the other attorneys and their clients both money and time through their efforts and the settlement likely will allow many Plaintiffs to see the monetary benefits in their lifetime.

### (e)     Not adequately documented

The PSC submitted affidavits of counsel and of an independent auditor to provide foundation for its request.  The Court then requested and received further information regarding average attorney and paralegal rates, with a break-down of the number of hours expended.  The Court finds that this is sufficient foundation at this time for making a request for a set-aside.  The Court notes that it will need additional specific information, such as billing records and time sheets, during the

next phase when the Court will review the Common Benefit Attorney Fee and Cost

Committee's recommendation as to how the Common Benefit Attorney Fee Fund

and the Common Cost Fund should be disbursed.  For now, however, the Common

Benefit Attorney Fee Fund and the Common Cost Fund are mere set-asides.

**(f)     Unfair to have the common benefit assessment taken off the top of the settlement fund**

Again, the Beasley Objection fails to acknowledge the fact that the parties

negotiated away from a straight assessment approach when they entered into the

MSA.  Further, although it appears as though using the percentage approach off the

top of the Settlement Fund results in the money coming from the individual clients

rather than from the attorney fee portion of a client's recovery, this is not actually

the case in light of the parties' intent as to what the Settlement Fund encompassed

during settlement negotiations.  Guidant agreed to pay one lump sum.  And as

Guidant acknowledged at the hearing, having the common benefit attorney fees

accounted for as part of the $240 million Settlement Fund was a part of the

negotiations.  Therefore, the $240 million Settlement Fund was to encompass *both*

client funds and common benefit attorney fee funds.

**(g)     The LCC has not shown that the State Court Plaintiffs benefited from their work**

The Court notes that this argument does have some merit, especially in relation to

those state court cases where a significant amount of work was done on behalf of

individual Plaintiffs with little to no sharing of work product from the MDL attorneys.

However, the state court Plaintiffs raising this objection fail to acknowledge that, at a

minimum, the MDL common benefit attorneys' extreme efforts in negotiating the global settlement and reaching a favorable result for all Plaintiffs, including the state Plaintiffs who originally were proceeding on their own, benefited all Plaintiffs.[20]  Therefore, the state Plaintiffs did benefit from the common benefit attorneys' work, and the common benefit fund should apply to their clients as well.  Further, the state court Plaintiffs have a choice as to whether to join in this global settlement or not.  The common benefit fund was a contemplated part of the settlement, and joining the settlement means they accept the terms of the settlement.

In addition, as explained further below, the contingency fees for every case, although capped, may be adjusted upwards to 33.33% based upon the amount of work done on the file and, if appropriate, the lack of benefit received from the MDL common benefit work.  Therefore, certain state court counsel may likely have just reason to petition the Special Masters for such an adjustment.  In addition, for those state court attorneys who believe they did a substantial amount of work that actually advanced the interest of all Plaintiffs, they can petition for common benefit funds themselves, as the Texas objectors have.

Based on the Court's equitable authority, and after applying the *Johnson* factors and upon careful consideration of the merits of the several objections and the acknowledgement that these objections represent the views of a substantial

---

[20]     The court notes that none of the objectors question the adequacy of the $240,000,000.00 settlement.  Nor do they question the quality of the services provided by the PSC and LCC.

number of claimants, the Court respectfully rejects the PSC's request to allow for

18.85% of the $240,000,000.00 Settlement Fund to be set aside for common

benefit fees.  Granting the PSC's request, when coupled with the current average

33% to 40% contingent fee arrangements, would result in 52% to 58% of the

recovery going toward attorney fees.  Simply put, this range is too high.  Instead, in

conjunction with capping contingency fees as explained below, the Court finds that

a 15% set-aside for common benefit attorney fees is justified.[21]

### B.    Lodestar Cross-check

The Court exercises its discretion to verify the reasonableness of the 15%

common benefit attorney fee set-aside by cross-checking it against lodestar.  *See*

*Petrovic*, 200 F.3d at 1157 (stating that the lodestar approach is "sometimes

warranted to double check the result of the 'percentage of the fund' method").  The

lodestar cross-check does not require mathematical precision, but is instead

determined by considering the unique circumstances of each case.  *See In re Rite*

*Aid Corp., Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005) ("The lodestar cross-check

calculation need entail neither mathematical precision nor bean-counting.").

---

[21]    The Court anticipates this figure to be more than enough to cover common benefit
attorney fees, especially in light of the fact that, in several instances, the number of hours
claimed as common benefit by attorneys appears high.  In other words, in the next phase,
where the specific common benefit attorney fee awards will be calculated, the Court
anticipates that after close scrutiny of the number of hours applied for, a substantial
portion of the purported common benefit hours will be rejected as either not being
performed for common benefit purposes or being duplicative.

Here, the PSC asserts a lodestar of $34,435,464.50. The PSC bases this amount on the asserted 98,540.13 hours of common benefit work it devoted to the litigation. The PSC, however, did not address the reasonableness of the differing attorney and paralegal rates that were applied to calculate their lodestar. Therefore, the Court requested that the LCC provide the average hourly rate for the attorneys who are claiming they performed common benefit work, the number of hours worked for each of these attorneys, the average hourly rate for paralegals who are claiming they performed common benefit work, and the number of hours worked for each of these paralegals. (*See* MDL 05-1708 (DWF/AJB), Doc. No. 2581.) After review of this information, the Court concludes that several attorneys/firm's average hourly rates are unreasonably high. Granted, a number of the common benefit attorneys are experienced and highly skilled attorneys who could charge $500.00 or $700.00 an hour in an individual client context. But in an MDL context like we have here, there are broader responsibilities. Attorneys in a complex MDL have a larger responsibility—not just to their client, but to all Plaintiffs with similar interests. In addition, part of an attorney's responsibility in doing common benefit work is to make the litigation more manageable and more efficient. In effect, this should drive down costs and expenses for everyone involved. In so doing, they serve the interests of their client, all Plaintiffs, the other attorneys involved, the Court, and the public. Also, by embracing these broader responsibilities, the result should be to proceed in such a manner so that their clients, and the public at large, feel that they are being treated in a fair and just manner. Therefore, the Court finds

that a reduction in the lodestar is necessary to accurately reflect the amount and value of the common benefit hours spent during the course of this litigation and settlement.

The LCC reported that the common benefit attorneys' average hourly rates range from $225.00 to $745.00, and the common benefit paralegals' average hourly rates range from $30.00 to $290.00. The Court believes that several firms have reported unreasonably high hourly rates and therefore finds it necessary to reduce the average reported rates for some of the firms. Specifically, when calculating the lodestar cross-check, the Court capped the attorney hourly rate at $400.00 and the paralegal hourly rate at $150.00,[22] resulting in a new overall average hourly rate for the attorneys of $379.40, and a new overall average hourly rate for the paralegals of $127.49. The Court concludes that these hourly rates are reasonable.

The LCC also reported in its supplemental materials that the total number of hours of common benefit work expended by attorneys is 73,205.73, and the total number of hours of common benefit work expended by paralegals is 34,915.30. The Court does not necessarily consider these numbers to be unreasonable on their face. However, the Court recognizes that the numbers reflect the work from fifty-five separate firms. The Court finds it inevitable that, because of the number of firms and attorneys involved, these numbers reflect some duplication of effort and/or unnecessary work performed, especially based on the Court's personal

---

[22]     The Court only substituted these average rates in its calculation if the average rate listed was higher than the $400.00 or $150.00 per hour.

knowledge of certain attorneys' involvement with the issues presented during the

pre-trial phase of this MDL.  The Court anticipates that after close scrutiny of the

number of hours applied for by the common benefit attorneys, a substantial portion

of the claimed common benefit hours will be rejected as either not being performed

for common benefit purposes or being duplicative of others' efforts or their own

efforts in their individual cases.  The Court therefore finds that a reduction of 10%

in the amount of hours asserted is appropriate to account for this duplication and

unnecessary work.  A 10% discount results in a new total of 65,885.16 hours for

common benefit work completed by attorneys, and a new total of 31,423.77 hours

for common benefit work completed by paralegals.

     After making the above adjustments, the Court calculates the lodestar at

$29,003,046.14.[23]  The 15% set-aside for the Common Benefit Attorney Fee Fund

($34,500,000.00) would therefore result in a multiplier of 1.19.  The PSC points to

other cases in which a larger lodestar multiplier was applied.  However, the PSC

neglects to address the specific circumstances in this MDL in comparison.  The

Court finds that a multiplier of 1.19 is reasonable under the circumstances of this

case.  This MDL began in November 2005, and the MSA was signed in December

2007.  Over this period of twenty-five months, certain counsel put in a substantial

amount of work to investigate claims and defenses, conduct discovery, brief

non-dispositive and dispositive motions (with some presenting difficult issues),

---

[23]    This equates to 12.61% of $230 million or 12.08% of $240 million.

prepare for trial, and participate in extensive settlement negotiations.  Other

counsel, however, did substantially less work, with some doing no more than filing

a Complaint and a Plaintiff Fact Sheet, or work requiring even less skill.[24]  In

addition, although some risk of nonpayment was involved for some attorneys, a

large multiplier for risk is not justified when the risk of no recovery was not

significant for most.[25]  *See In re Infospace*, 330 F. Supp. 2d at 1215 (noting that

where [t]here was only a modest risk to recovery[,] a large multiplier is not

warranted").  Here, where there are large economies of scale to consider, the Court

finds that a slight multiplier is justified; however, anything more than a slight

multiplier would result in an unreasonable large attorney fee and/or would promote

providing windfalls to certain undeserving attorneys.

---

[24]    The Court acknowledges that some time and effort is required to fill out the
Plaintiff Fact Sheets and that firms incur some costs for screening cases, conducting
investigations, and researching.  But in comparison, this is a relatively small amount of
work done on a file compared to those cases that were selected for bellwether trials.  In
addition, the Court notes that those attorneys with many individual cases benefited from
work either previously done by themselves in their other cases or from others in the
MDL.  The Court finds that these economies of scale must be taken into account when
determining the reasonableness of the set-aside for attorney fees.

[25]    Here, especially after the MDL had commenced and the LCC and PSC had been
created, those Plaintiff attorneys filing new cases in the MDL and/or outside of the MDL
that were later transferred into the MDL faced relatively little risk, as they would have
known that they would need to expend little costs because the bulk of the work would be
done by other attorneys than themselves.

       In addition, the Court notes that there was also an on-going government
investigation regarding Guidant's alleged misconduct.  This presumably had at least some
impact on promoting settlement, and therefore reduced some of the risk on the part of the
Plaintiffs.

Therefore, based on the Court's equitable authority, and utilizing the

relevant *Johnson* factors and a lodestar cross-check, the Court orders that

$34,500,000.00 (15% of $230,000,000.00; 14.375% of $240,000,000.00) shall be

set aside for common benefit attorney fees.  This $34,500,000.00 set-aside fund

shall be referred to as "the Common Benefit Attorney Fee Fund."  Any funds

ultimately not dispersed from the Common Benefit Attorney Fee Fund will be

thereafter dispersed to the claimants on a pro rata basis.

## C.     Common Benefit Attorney Fee and Cost Committee

This Court is authorized to create a committee, made up of lead counsel and others

representing certain categories of objectors and non-objectors, to allocate fees among all

counsel entitled to share in the common benefit fund.  *See In re Diet Drugs*, 2002 WL

32154197, at *22 (citing cases).  Lead counsel for both the state and federal cases are

generally "better able to decide the weight and merit of each other's contributions."  *Id.*

(quoting *In re Copley Pharm., Inc., Albuterol Prods. Liab. Litig.*, 50 F. Supp. 2d 1141,

1148 (D. Wyo. 1999)); *see also In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216, 223

(2d Cir. 1987) ("Even after the court makes the allocation, the attorneys may be in a

better position to judge the relative input of their brethren and the value of their services

to the class.").  Further, by appointing counsel to the committee who did not play as

significant a role as lead counsel will allow for a nonbiased cross-check on lead counsel's

recommendations.  Notably, however, "the appointment of a committee does not relieve a

district court of its responsibility to closely scrutinize the attorneys' fee allocation,

especially when the attorneys recommending the allocation have a financial interest in the

resulting awards." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, --- F.3d ---, No. 07-30384, 2008 WL 287347, at *4 (5th Cir. Feb. 4, 2008).

Here, out of the Court's interest to be efficient and fair, the Court orders that a fee and cost allocation committee shall be created for the purpose of recommending to the Court the specific allocation of attorney fees and costs among all counsel entitled to share in the Common Benefit Attorney Fee Fund and all counsel and/or parties entitled to share in the Common Cost Fund. The committee shall be called the Common Benefit Attorney Fee and Cost Committee ("CBAFCC"). The Court hereby appoints the following Attorneys to the CBAFCC:

- Charles Zimmerman, Esq., of Zimmerman Reed, PLLP. Mr. Zimmerman is Plaintiffs' Liaison Counsel, a member of the MDL Lead Counsel Committee, and lead member of the Negotiation Committee.

- Elizabeth Cabraser, Esq., of Lieff, Cabraser, Heimann & Bernstein LLP. Ms. Cabraser is a member of the MDL Lead Counsel Committee.

- Christopher A. Seeger, Esq., of Seeger Weiss LLP. Mr. Seeger is a member of the MDL Plaintiffs' Steering Committee.

- Nicholas J. Drakulich, Esq., of Jennings & Drakulich, LLP. Mr. Drakulich is a member of the MDL Plaintiffs' Steering Committee.

- Michael K. Johnson, Esq., of Goldenberg & Johnson, PLLC. Mr. Johnson represents Minnesota state plaintiffs and MDL plaintiffs.

- Gale D. Pearson, Esq., of Pearson, Randall & Schumacher, PA. Ms. Pearson represents Minnesota state plaintiffs and MDL plaintiffs.

The Court designates Charles Zimmerman, Esq., to serve as chair of the CBAFCC and hopes that each of the above individuals embrace this important task.

The CBAFCC shall submit to the Court for approval its proposed policies, procedures, guidelines, and protocol for performing its assigned task on or before February 29, 2008.[26]

The CBAFCC shall file and serve a proposed allocation plan within 60 days of the Court's February 15, 2008 Short Order for court review and approval.  The allocation plan should be fair and equitable, and should be the result of careful scrutiny of all applications for common benefit fees and costs.  Common benefit attorney fees shall only compensate work that advanced the interest of all plaintiffs.  Time spent developing or processing individual cases (except for those selected to proceed as representative trials), will not be considered common benefit time.  In addition, time spent merely attending a meeting or conference related to the MDL when the attorney's presence was not reasonably necessary, will not be considered common benefit time.[27]  Furthermore,

---

[26]     The Court notes that it received the CBAFCC's proposal on February 28, 2008. On March 3, 2008, the Court issued an Order approving for distribution and use of the CBAFCC's proposal.

[27]     For guidance, see *In re Sulzer*, 268 F. Supp. 2d at 925 (disallowing the following fees: "(1) fees related to attendance at the initial MDL Panel hearing in Washington, D.C., unless the attorney actually presented argument in relation to the Motion to Consolidate the Sulzer cases; (2) fees related to attendance at conferences sponsored by ATLA, Mealey's, or similar groups, unless the attorney was authorized to make a presentation to the group by MDL lead counsel or the Special State Counsel Committee; (3) fees related to attendance at depositions by more than one attorney per law firm, unless the law firm actually conducted the deposition; (4) fees related to attendance at any meeting that was related primarily

(Footnote Continued on Next Page)

special care should be given when evaluating the attorneys' time entries.  Time spent that

is duplicative and excessive in light of the particular attorney's role in the litigation will

not be considered common benefit time.

This procedure does not preclude the CBAFCC and all applicants entitled to an

award to reach an agreed-upon allocation, subject to Court review.  However, if an

agreement is not reached, any objection to the proposed allocation plan shall be filed and

served within 7 days of the filing of the proposed allocation plan.  The CBAFCC may

then file a response within 4 days after the filing of any objections.  The Court will decide

any pending issues and order the disbursement of funds after consideration of the

CBAFCC's proposed allocation plan, any objections, and any response.

## III.    Contingency Fees

Courts have a vested interest in attorney fee contracts.  The fairness of the terms of

such agreements reflects directly on the Court and the legal profession.  Attorneys must

keep in mind that the primary purpose of MDLs is to "promote the just and efficient

conduct of such actions."  28 U.S.C. § 1407(a).  Consequently, this Court has the explicit

power to require reasonable fees in class actions.  *See* Fed. R. Civ. P. 23(g)(1)(C); Fed. R.

Civ. P. 23(h); *cf*. Fed. R. Civ. P. 23 (e)(1)-(2) (addressing approval of settlement terms).

---

(Footnote Continued From Previous Page)
to an individual case, and not the MDL; and (5) fees related to attendance at any
MDL conference or hearing, unless the attorney:  (a) was Class Counsel, Special
Counsel, a member of the Plaintiffs' Steering Committee, or a member of the
Special State Counsel Committee, or (b) actually engaged in material, substantive
participation at the conference or hearing").

Here, like in *In re Zyprexa Products Liability Litigation*, "[w]hile the settlement . . . is in the nature of a private agreement between individual plaintiffs and the defendant, it has many of the characteristics of a class action and may be properly characterized as a quasi-class action subject to general equitable powers of the court." 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (citing Fed. R. Civ. P. 23(g)(C)(iii); Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 1 ("just . . . determination of every action"); *cf.* Fed. R. Civ. P. 23(e)(1)(2) (dealing with approval of terms of settlement)). Therefore, this Court has the explicit power to require reasonable fees here.

Further, this Court has the inherent right and responsibility to supervise the members of its bar in both individual and mass actions, including the right to review contingency fee contracts for fairness. *See, e.g., Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*, 623 F.2d 1255, 1277 (8th Cir. 1980) ("The court has the power and the responsibility to monitor contingency fee agreements for reasonableness."); *Rosquist v. The Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982) ("The district court's appraisal of the amount of the fee is . . . justified by the court's inherent right to supervise members of its bar."); *see also Taylor v. Bemiss*, 110 U.S. 42, 45-46 (1884) ("This . . . does not remove the suspicion which naturally attaches to such [contingency] contracts, and where it can be shown . . . that the compensation is clearly excessive, . . . the court will in a proper case protect the party aggrieved."). "Even when the validity of the fee contract itself has not been challenged by the parties, it is within the court's inherent power of supervision over the bar to examine the attorney's fee for conformance with the reasonable standard of the Code of Ethics." *Rosquist*, 692 F.2d 1107, 1111 (citing

*Farmington Dowel Prods. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 90-91 (1st Cir. 1969)).

In other words, the court has the authority to inquire into fee arrangements to protect

clients from excessive fees and suspected conflicts of interest.  *In re Michaelson*, 511

F.2d 882, 888 (9th Cir. 1975); *see also Gair v. Peck*, 160 N.E.2d 43, 48 (N.Y. 1959)

("Contingent fees may be disallowed as between attorney and client in spite of contingent

fee retainer agreements, where the amount becomes large enough to be out of all

proportion to the value of the professional services rendered.").[28]

Here, the Court agrees with Judge Weinstein's observation that "[l]itigations like

the present one are an important tool for the protection of consumers in our modern

corporate society, and they must be conducted so that they will not be viewed as abusive

by the public; they are in fact highly beneficial to the public when adequately controlled."

*In re Zyprexa*, 424 F. Supp. 2d at 494.  In this MDL, many of the individual Plaintiffs are

both physically ill and aging and, understandably, do not have the strength or knowledge

to negotiate fair fees for themselves.[29]  And as for the representative counsel involved,

Plaintiffs' counsel have a built-in conflict of interest that is directly opposed to that of

---

[28]     The PSC concedes that "the Court is authorized to evaluate the propriety and
appropriateness of contingency agreements between individual claimants and their
attorneys." (The PSC's Request 15, n.7 (citing *Int'l Travel Arrangers*, 623 F.2d at 1277;
*In re Agent Orange*, 818 F.2d at 240 ("It is well established that a district court, pursuant
to its rulemaking authority or on an *ad hoc* basis, may review a contingency fee
arrangement.")).

[29]     Even if certain Plaintiffs did have the strength or knowledge to negotiate fair fees
for themselves and remain content with their fee agreements, such willingness to abide by
their fee contracts "is relevant but not controlling, for the object of the court's concern is
not only a particular party but the conformance of the legal profession to its own high
standards of fairness."  *Farmington Dowel*, 421 F.2d at 90, n.62.

their clients.  And Defense counsel are generally disinterested in how the Settlement

Fund is divided up or the manner in which contingency fees affects individual Plaintiff's

recoveries.  Therefore, only this Court, along with the appointed Special Masters, can

effectively exercise the ethical control of fees and properly monitor fee division to protect

all Plaintiffs' interests.

Here, the Court is presented with the unique circumstance where some attorneys

performed common benefit work, some did not; some attorneys performed individualized

work on their individual cases, some did not; and some attorneys represent hundreds of

Plaintiffs, while other attorneys represent few.  In addition, for those attorneys that did

perform individualized work on their individual cases, some received or should have

received common benefit from the LCC, PSC, and others, thereby reducing their time

needed and costs incurred, while others proceeded outside the MDL and did not receive

common benefit from the LCC, PSC, and others, except for their work during the

settlement negotiation process.  Because of the mass nature of this MDL, the fact that

several firms/attorneys benefited from economies of scale, and the fact that many did or

should have benefited in different degrees from the coordinated discovery, motion

practice, and/or global settlement negotiations, there is a high likelihood that the

previously negotiated contingency fee contracts would result in excessive fees.  *See In re*

*Zyprexa*, 424 F. Supp. 2d at 490 (stating that "[l]imiting fees is particularly appropriate in

the instant litigation since much of the discovery work the attorneys would normally have

done on a retail basis in individual cases has been done at a reduced cost on a wholesale

basis by the plaintiffs' steering committee").

Therefore, although the fee arrangements may have been fair when the individual litigations were commenced, the Court concludes that many of the fee arrangements are likely not fair now because of the common benefit work and economies of scale noted above.

Thus, based on the Court's general equitable powers, the Court's inherent authority to exercise ethical supervision over this global settlement, and the Court's inherent authority to review contingency fee contracts for fairness, the Court hereby caps all individual case contingency fees at 20%.[30]  However, in order to assure that all attorneys receive fair but not excessive compensation, parties may petition the Special Masters to have the 20% increased upward to a maximum of either 33.33%, the percentage previously agreed to in the individual cases contingent fee arrangement between the attorney and the client, or the limit

---

[30]    The Court finds that anything more than 20% would result in excessive fees based on the unique contours of this case.  For example, setting aside 10% of the $240,000,000.00 for costs, 15% of the remaining $230,000,000.00 for the Common Benefit Attorney Fee Fund, and allowing 30% across the board for attorney fees, results in 38.81% of the total Settlement Fund going strictly toward attorney fees. Setting aside 10% of the $240,000,000.00 for costs, 15% of the remaining $230,000,000.00 for the Common Benefit Attorney Fee Fund, and allowing 25% across the board for attorney fees, results in 34.73% of the total Settlement Fund going strictly toward attorney fees. Both of these scenarios result in a total attorney-fee award that is too high.  Instead, setting aside 10% of the $240,000,000.00 for costs, 15% of the remaining $230,000,000.00 for the Common Benefit Attorney Fee Fund, and allowing 20% across the board for attorney fees, results in 33.67% of the total Settlement Fund going strictly toward attorney fees, which the Court finds reasonable under the circumstances.

imposed by state law, whichever of the three is less.[31]  The Special Master, upon

review of the petitioner's file and submissions, shall make a recommendation to the

Court as to what contingent fee percentage is reasonable under the circumstances

of the particular case and the work completed by the individual attorney/firm on

the case.[32]  The Court will thereafter approve or decline the recommendation upon

review of the circumstances.

---

[31]     The Court acknowledges that it had originally capped the contingency fees for
non-common benefit attorneys at 25%.  But originally, the Court contemplated that the
Special Masters would review the fees and have the discretion to adjust those fees
downward and, in fact, anticipated that many of such cases would be adjusted downward.
Because of the burden and lack of manageability this would put on the Special Masters
via the anticipated number of situations needing a downward adjustment, the Court now
removes the downward adjustment component, and sets a floor at a percentage the Court
believes many cases would have been adjusted to previously.  In other words, by
removing the downward adjustment component, the Court finds it justified to lower the
fee cap from 25% to 20%.

        In addition, the Court finds that capping the contingency fees at 20% addresses its
concerns for economies of scale (*i.e.,* situations where attorneys/firms would be receiving
an unfair amount in compensation based on the fact that he or she has a substantial
number of cases at issue, with an insubstantial amount of work done in each of the files),
and its concerns of overlap in hours or "double-dipping" on the part of attorneys applying
for common benefit funds.  And, the Court finds that by setting the floor at 20% for all
attorneys, rather than having a separate cap or floor for common benefit attorneys and
non-common benefit attorneys, all claimants will be treated fairly and equally in their
respective recoveries.

[32]     Circumstances justifying an increase in contingent fees may include the following:
(1) the relationship between the amount received from the Common Benefit Attorney Fee
Fund and the amount received from a contingent fee award (*i.e.*, a contingent fee award
may be fairly increased if an attorney/firm will be receiving less than adequate
compensation through his or her common benefit request); (2) the amount of work done
on a file (*i.e.*, a contingent fee award may be fairly increased if an attorney/firm can
prove that they legitimately put in a substantial amount of work on behalf of the
individual plaintiff); and (3) the lack of benefit received from the work completed in the

(Footnote Continued on Next Page)

**CONCLUSION**

The Court notes that it spent a substantial amount of time considering the different options for awarding and limiting attorney fees to adequately reflect the unique circumstances of this MDL and its global settlement.   In so doing, the Court's primary goal was to be fair and reasonable to all attorneys and Plaintiffs involved, keeping in mind that the attorneys should receive adequate but not excessive compensation for their time.  The Court believes that the resulting set-asides and the regulation of contingency fees in individual cases will accomplish those goals.  Although some counsel may cringe at the idea of having the Court cap their contingency fees, the Court has a responsibility to give close scrutiny and vigilance to the issue of what constitutes reasonable attorney fees.  The Court feels that it has done so here.  The 20% fee cap, while allowing for counsel to petition to have the fee increased to 33.33% if justified, allows the Court to factor in the benefits received by Plaintiffs from common benefit work completed.  Furthermore, the Court attempts to reach a delicate but appropriate balance between attorneys' interests, the heightened criticism of excessive fees often expressed by the public in mass tort litigation, the Court's and public's interest in allowing reasonable but not excessive fees in such a manner that still encourages highly qualified attorneys to devote time to complex, time-consuming cases like this MDL, and the preservation of the

---

(Footnote Continued From Previous Page)
MDL (*i.e.*, a contingent fee award may be fairly increased if an attorney/firm performed a substantial amount of work in their individual case and were proceeding without the benefit of work completed in the MDL).

integrity and independence of the legal profession.  The Court believes it has achieved

such a balance here.

Accordingly, **IT IS HEREBY ORDERED** that:

1.      The PSC's Request Pursuant to Section II.K of the Master Settlement

Agreement for a Determination of the Common Benefit Attorney Fee Amount (MDL No.

05-1708 (DWF/AJB), Doc. Nos. 2595, 2598) is **GRANTED IN PART AND DENIED**

**IN PART** as follows:

a.      The Court orders that $10,000,000.00 of the $240,000,000.00

settlement fund be set aside for common costs.  This $10,000,000.00

set-aside fund shall be referred to as "the Common Cost Fund."  Any

amount from the Common Cost Fund remaining after all common costs

have been paid is to be distributed to the claimants on a pro rata basis.

b.      The Court orders that $34,500,000.00 (15% of

$230,000,000.00; 14.375% of $240,000,000.00) be set aside for common

benefit attorney fees.  This $34,500,000.00 set-aside fund shall be referred

to as "the Common Benefit Attorney Fee Fund."  Any funds ultimately not

dispersed from the Common Benefit Attorney Fee Fund will be thereafter

dispersed to the claimants on a pro rata basis.

c.      The Court orders that a fee and cost allocation committee be

created for the purpose of recommending to the Court the specific allocation

of attorney fees and costs among all counsel entitled to share in the

Common Benefit Attorney Fee Fund and all counsel and/or parties entitled

to share in the Common Cost Fund.  The committee shall be called the
Common Benefit Attorney Fee and Cost Committee ("CBAFCC").  The
Court hereby appoints Charles Zimmerman, Elizabeth Cabraser,
Christopher A. Seeger, Nicholas J. Drakulich, Michael K. Johnson, and
Gale D. Pearson to the CBAFCC.  The Court designates Charles
Zimmerman to serve as chair of the CBAFCC.

The CBAFCC shall file and serve a proposed allocation plan within
60 days of the date of this Order for court review and approval.  This
procedure does not preclude the CBAFCC and all applicants entitled to an
award to reach an agreed-upon allocation, subject to Court review.
However, if an agreement is not reached, any objection to the proposed
allocation plan shall be filed and served within 14 days of the filing of the
proposed allocation plan.  The CBAFCC may then file a response within
7 days after the filing of any objections.  The Court will decide any pending
issues and order the disbursement of funds after consideration of the
CBAFCC's proposed allocation plan, any objections, and any response.

d.      The Court hereby caps all individual case contingency fees at
20%.  Parties may petition the Special Masters to have the 20% increased
upward to a maximum of either 33.33%, the percentage previously agreed to
in the individual cases contingent fee arrangement between the attorney and
the client, or the limit imposed by state law, whichever of the three is less.
The Special Master, upon review of the petitioner's file and submissions,

shall make a recommendation to the Court as to what contingent fee

percentage is reasonable under the circumstances of the particular case and

the work completed by the individual attorney/firm on the case.  The Court

will thereafter approve or decline the recommendation upon review of the

circumstances.


Dated:  March 7, 2008                          s/Donovan W. Frank
                                               DONOVAN W. FRANK
                                               Judge of United States District Court