# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: GUANT CORP. IMPLANTABLE DEFIBRILLATORS PRODUCTS LIABILITY LITIGATION | MDL No. 05-1708 (DWF/AJB) |
| This Document Relates to All Actions | **MEMORANDUM OPINION AND ORDER REGARDING SPECIAL MASTERS' JUNE 30, 2008 REPORT AND RECOMMENDATION CONCERNING INDIVIDUAL CONTINGENCY FEES** |

This matter is before the Court on the Special Masters' June 30, 2008 Report and Recommendation (the "R&R") and the Objections filed with respect to the R&R. In the R&R, the Special Masters recommend that the Court set all individual contingency fees, including fees for those attorneys who did not petition for an increase, at 25%. (Doc. No. 3145.)[1] Pursuant to the procedure outlined in the Court's March 7, 2008 Order, the Court conducted an exhaustive *de novo* review of the sixty-seven petitions submitted prior to the R&R. The Court also reviewed seventeen objections filed on the R&R.

Based upon the submissions of the parties, including the pleadings, records, and arguments of counsel, and for the reasons stated herein, the Court respectfully declines to adopt the R&R. Instead, for the reasons set forth below, the Court caps the *total* attorney fees (contingency *plus* common benefit attorneys fees) in each case at: (1) 37.18%;

---

[1] All document numbers referenced are to MDL No. 05-1708 (DWF/AJB).

(2) the contracted-for contingency fee rate; or (3) the state-imposed contingency fee limit *(whichever is less)*.

## BACKGROUND

### I.     General Background

This multi-district litigation ("MDL") commenced in November 2005 when the Judicial Panel on Multidistrict Litigation consolidated certain actions and transferred them to the District of Minnesota for pre-trial proceedings against Defendants Guidant Corporation, Guidant Sales Corporation, and Cardiac Pacemakers, Inc. (collectively, "Guidant"). Individual Claimants[2] commenced these actions for injuries alleged to have been caused by certain defective implantable defibrillator devices and pacemakers manufactured by Guidant.

At times, this MDL has been both fast-paced and slow-paced. Initially, the case proceeded very rapidly. By November 2006, the Court had established a trial schedule, which was later amended, for five bellwether trials.[3] (Doc. Nos. 954, 1187, 1358, and 1421.) The first bellwether trial for Leopoldo Duron, Jr., an "explant without complications" case, was set to begin on July 30, 2007. In anticipation of the bellwether trials, the parties conducted extensive discovery and engaged in motion practice, which culminated in the Court ruling on two motions to dismiss, ten summary judgment

---

[2]     For the sake of consistency and simplicity, the Court will refer to the parties who are subject to the terms of the MSA and the jurisdiction of this Court as "Claimants," consistent with §§ I.D, III.F, and VI.A-B of the Master Settlement Agreement.

[3]     Initially, the Court was to try six bellwether trials, including a death case. Later, the Plaintiff Steering Committee and Guidant stipulated not to proceed with a death bellwether trial. (Doc. No. 1046.)

motions, Duron's Motion for Application of Minnesota law, and thirty-two *Daubert* issues.[4]  During that time, Magistrate Judge Arthur J. Boylan (who was later assisted by Assistant Special Master Patrick A. Juneau) worked with the parties to fashion a settlement.

The parties entered into a proposed settlement on July 12, 2007, at which time the pace of the public aspects of the case slowed measurably.  Then, the parties signed a term sheet with a negotiated settlement fund of $195,000,000.00.  That amount included payment for both Claimants' recoveries and for common benefit attorney fees.

Soon thereafter, the parties commenced a renegotiation process that lasted approximately four months. The renegotiation contemplated a global settlement covering Claimants from both the MDL and state cases.  It included Claimants whose cases had been filed or transferred to the MDL, Claimants whose cases were filed outside the MDL in state court proceedings, and potential Claimants who had not yet filed their cases.  The renegotiation process resulted in a new term sheet, increasing the total settlement fund to $240,000,000.00.  As before, the total settlement fund included payment for Claimants' recoveries and for common benefit attorney fees.  Nearly five months after the first proposed settlement was reached, the parties finally entered into a Confidential Master Settlement Agreement ("MSA") on December 10, 2007.

---

[4]    The Court heard numerous motions *in limine* in the *Duron* case that were under advisement and stayed pending settlement.  The Court also ruled on many other pretrial issues presented by the parties and other motions directed specifically at individual cases.

When the settlement was first reached, the parties anticipated that Claimants

would receive their awards in December 2007.  Unfortunately, the parties underestimated

the amount of time needed to deliver the award.  Today, the PSC ("Plaintiff Steering

Committee") optimistically, but quite possibly unrealistically, asserts that the first rolling

payments to Claimants will begin by the end of this year.

## II.    Contingency Fees

As is typical with this type of mass tort litigation, Claimants who were represented

by counsel entered into contingency fee agreements with their attorneys.  In early

January 2008, Charles Zimmerman, Plaintiffs' Liaison Counsel, notified Claimants and

their counsel that there would be a hearing on a request by the PSC for a Determination

of the Common Benefit Attorney Fee Amount, which the PSC made pursuant to § II.K of

the MSA.  In the PSC's request, it footnoted the following:

> It should be noted that this Court has the inherent authority to order an
> appropriate assessment to compensate common benefit attorneys for their
> substantial efforts.  Among other things, the Court is authorized to evaluate
> the propriety and appropriateness of contingency agreements between
> individual claimants and their attorneys.

(Doc. No. 2595 at 15, n.7 (citing cases).)  The Court held a hearing on the PSC's request

on January 23, 2008.  At that hearing, no one disputed the Court's inherent authority to

inquire into the reasonableness of individual attorneys' contingency contracts.  (*See, e.g.,*

Jan. 23, 2008 Tr. at 35.)  On February 4, 2008, the Court ordered the PSC and others to

provide additional information concerning common benefit requests and contingency

fees.  (Doc. No. 2581.)  The Court received that information under seal on

February 11, 2008.  (Doc. No. 2594.)  At that time, the Court reviewed the contracted-for

contingency fees only for those attorneys who also made common benefit requests.

On February 15, 2008, the Court issued an Order, granting in part and denying in

part the PSC's request for an award of common benefit attorney fees and indicating that a

Memorandum Opinion and Order would follow.  (Doc. No. 2603.)  In the February 15,

2008 Order, the Court set limits on the individual contingency fees, depending on

whether an attorney had applied for common benefit fees.  (*Id*. at 5-6.)  The Court

followed with a Memorandum Opinion and Order issued on March 7, 2008, which

amended in part the February 15, 2008 Order to the extent that it capped all individual

contingency fees at 20%, regardless of whether an attorney had applied for common

benefit fees.  (Doc. No. 2636 at 40-45.)  The basis for the cap included the mass nature of

the MDL, the fact that many attorneys likely benefited from economies of scale, and the

fact that many attorneys did or should have benefited in differing degrees from the

coordinated discovery, motion practice, and/or global settlement negotiations that took

place in the MDL.  The Court also provided a detailed analysis of case law surrounding

the Court's inherent right and responsibility to review contingency fee contracts for

fairness.  (*Id*.)  Finally, the Court allowed a procedure by which individual attorneys

could petition the Special Masters for an upward departure from the 20% cap, after which

the Court would either approve or decline the Special Masters' recommendation.  (*Id*. at

44-45 (describing specific circumstances that would justify an increase).)

Pursuant to District of Minnesota Local Rule 7.1(g), thirteen attorneys and/or law firms[5] sought to file motions to reconsider the Court's March 7, 2008 Order concerning contingency fees.[6]  On March 31, 2008, the Court denied those requests and addressed the four main arguments presented by the thirteen requests.[7]  (Doc. No. 2696.)  Those four arguments included:  (1) arguments that the parties were not provided with notice that the Court's March 7, 2008 Order would affect individual contingency fees; (2) questions related to the Court's power to enter such an Order; (3) arguments related to the fairness of a 20% cap; and (4) a request by the Plaintiff's Lead Counsel Committee ("LCC") to take judicial notice of a stipulation signed by eight attorneys to set all individual contingency fees at a 25% cap.  (*Id*.; *see also* Doc. No. 2685.)

---

[5]   The following thirteen attorneys and/or law firms sought reconsideration: (1) Alvarez Law Group; (2) Martinez, Manglardi, Diez-Arguelles & Tejedor, P.A.; (3) Heninger Garrison Davis, L.L.C.; (4) Palazzo Law Firm; (5) Murphy & Anderson, P.A.; (6) Kopelman Law Group, P.C.; (7) The Mulligan Law Firm; (8) Cory Watson Crowder & DeGaris, P.C.; (9) Burg Simpson Eldredge Hersh & Jardine, P.C.; (10) Parker Waichman Alonso LLP; (11) Morgan & Morgan P.A.; (12) Charles S. Zimmerman Esq., of Zimmerman Reed, PLLP, Richard J. Arsenault, Esq., of Neblett, Beard & Arsenault, Elizabeth J. Cabraser, Esq. of Lieff, Cabraser, Heimann & Bernstein, LLP, and Seth R. Lesser, Esq. of Locks Law Firm, PLLC (collectively, "the LCC"); and (13) Douglas M. Schmidt, Esq., Ron Rash, Esq., and Chad Aaronson, Esq.

[6]   The Court had ordered the parties not to seek reconsideration of the Court's February 15, 2008 Order; instead, the Court instructed the parties to wait to seek reconsideration of the Memorandum Opinion and Order that was to follow.  (Doc. No. 2604.)

[7]   The Mulligan Law Firm and Heninger, Garrison, & Davis, LLC also appealed the Court's March 7, 2008 Order.  (Doc. Nos. 2851 & 2856.)  The United States Court of Appeals for the Eighth Circuit, in a summary dismissal, dismissed those appeals for lack of jurisdiction.  (Doc. Nos. 3115 & 3129.)

On April 9, 2008, pursuant to the Court's March 7, 2008 Order, the Special

Masters established a procedure by which counsel could seek an increase in the

contingency fee cap and then the Special Masters would make a recommendation as to

what a reasonable contingency fee should be in a particular case.  (Doc. No. 2744.)

Sixty-seven attorneys and/or law firms petitioned for such an increase.[8]  Many firms

---

[8]     The following sixty-seven attorneys and/or law firms filed petitions:
(1) Aaronson/Rash, PLLC; (2) Alvarez Law Firm; (3) Alvis & Willingham; (4) Audet &
Partners, LLP; (5) Becnel Law Firm; (6) Black Duggan & Moss, P.C.; (7) Bohrer &
Lukeman; (8) Bourland, Heflin, Alvarez, Minor & Matthews, PLC; (9) DeGraff Foy &
Kunz, LLP; (10) Domina Law Group, PC LLO/James Gotschall; (11) Frank L. Branson,
P.C.; (12) Cellino & Barnes, P.C.; (13) Climaco, Lefkowitz, Peca, Wilcox, and Garofoli
Co., L.P.A.; (14) Cook, Hall & Lampros, LLP; (15) Kathryn P. Cooney, Esq.; (16) Cory,
Watson, Crowder, & DeGaris, P.A.; (17) Burg Simpson Eldredge Hersh & Jardine, P.C.;
(18) Douglas & London, P.C.; (19) Christian Earl Eaby, Esq.; (20) Law Offices of
Andrew L. Ellis, Esq.; (20) Fayard & Honeycutt, P.C.; (22) Forizs & Dogali, P.A.;
(23) F. Page Gamble, P.C.; (24) Gibson, McAskill & Crosby, LLP; (25) Anapol,
Schwartz, Weiss, Cohen, Feldman & Smalley, P.C.; Hill Williams, PLLC; Clark, Perdue
& List LPA; and Hill, Peterson, Carper, Bee & Deitzler, PLLC (collectively "the Guidant
& Medtronic Heart Device Litigation Alliance"); (26) Neblett, Beard & Arsenault;
Aylstock, Witkin, Kreis & Overholtz, PLLC; Barrios & Kingsdorf; Lundy & Davis; and
Andrus Boudreaux, PLC (collectively, "the Guidant Litigation Group"); (27) Heninger
Garrison Davis, LLC; (28) Hersh & Hersh; (29) Hill, Bean-Ward, Kruse, Wilson &
Wright, LLC; (30) Hollis Law Firm; (31) Johnson Law Firm; (32) Robert W. Kerpsack
Co., LPA; (33) Kopelman Law Group, P.C.; (34) Levy, Angstreich, Finney, Baldante,
Rubenstein & Cohen, P.C.; (35) Lewis, Kullman, Sterbcow & Abramson; (36) Martin &
Jones; (37) Martinez, Manglardi, Diez-Arguelles & Tejedor, P.A.; (38) Matheson,
Mortensen, Olsen & Jeppson.; (39) McMahan Law Firm; (40) Meiselman, Denlea,
Packman, Carton & Eberz, P.C.; (41) Miller Firm, LLC; (42) Morgan and Morgan, P.A.;
(43) Moskowitz, Passman & Edelman; (44) Murphy & Anderson, P.A.; (45) Palazzo Law
Firm; (46) John J. Pentz, Esq.; (47) Preti, Flaherty, Beliveau & Pachios; (48) Price Owen
Law; (49) Pulaski & Middleman, LLC; (50) Martin A. Ramey, Esq.; (51) Reich &
Binstock, LLP; (52) The Mulligan Law Firm; (53) G. Martin Meyers, Esq., and
Honorable Rosalie B. Cooper (Retired Judge of the Superior Court of New Jersey);
(54) James A. Rodman, Esq.; (55) SandersVienerGrossman, L.L.P.; (56) Schiffrin,
Barroway, Topaz, and Kessler; (57) Seeger Weiss, LLP; (58) Sheldon J. Schlesinger,
P.A.; (59) Sheller Law Offices; (60) Robert W. Sink, Esq.; (61) Sonkin, Fifer & Gershon;
(62) Dianne Wallwey, Esq.; (63) Wexler, Toriseva, and Wallace, LLP; (64) Whatley,

(Footnote Continued on Next Page)

based their requests for an increase on the actual amount of time that individual attorneys and/or paralegals spent on each particular case for, among other things, obtaining and reviewing medical records, consulting with doctors, negotiating with insurance companies, retaining experts, completing numerous forms, performing probate or bankruptcy work, and dealing with clients who were often difficult to communicate with because of their age or poor health.  Many attorneys noted that because they only had a small number of clients, they did not benefit from the economies of scale as did firms with larger numbers of clients.  Some bigger firms based their requests for increases on the work that they had performed that benefited all of their clients—things such as monthly newsletters, websites, and the like.  Other firms cited to hundreds of thousands of dollars spent on advertising to find clients and the resulting time spent screening clients to determine whether they had recalled devices.  Others discussed the high cost of running law offices in big cities as a reason to justify an upward departure.  Still other firms cited the fact that they received many of their cases as referrals and were obligated to pay, in some instances, 15% referral fees.  Many firms questioned the constitutionality of the Court's decision to cap contingency fees.

Admirably, at least one firm requested that the Court allow the firm to reduce its contingency fee below 20% because the firm had represented to its clients that the total amount of attorney fees *plus* costs would not exceed the contracted-for amount, and a

(Footnote Continued From Previous Page)
Drake, and Kallas, LLC; (65) Wiggin & Nourie, P.A.; (66) Zukerman, Daiker, & Lear Co., L.P.A.; and (67) Robinson, Calcagnie, & Robinson.

contingency fee of 20% would exceed the contracted-for amount.  Some firms submitted

detailed billing records documenting extensive contacts with individual clients.  Some

firms actually evaluated their entire pool of cases and submitted petitions only on behalf

of clients who, in the firm's view, actually merited an increase based on the amount of

work performed.

On June 30, 2008, the Special Masters entered the R&R.  (Doc. No. 3145.)

Acknowledging that the right to contract for contingency fees is subject to certain judicial

restraints, the Special Masters generally evaluated the sixty-seven petitions and

concluded that a number of factors justified increasing contingency fees in all cases to

25%.  The Special Masters' reasons included, but were not limited to, the complexity and

undesirability of the case, the settlement value, and the experience and abilities of

petitioning attorneys.  Specifically, the Special Masters concluded:

> Pursuant to the directive of the Court, the Special Masters received and
> reviewed the numerous submissions for increases in the contingency fees.
> The analysis of those submissions clearly demonstrated that there was a
> common and necessary level of work that was performed in all of these
> cases.  While the extent of work may have differed in all cases, the
> differences were not to an extent that would allow the Special Masters to
> make a fair and equitable recommendation as to different percentages
> between the various cases.  The Special Masters did conclude that the
> common and necessary work performed in each of these cases
> demonstrated that an individual case contingency fee of 25% would be fair,
> equitable, and justified.  Accordingly, the Special Masters recommend that
> the Court set all individual contingency fees at 25%.  Furthermore, any
> written objections to the Special Masters' Report and Recommendation
> must be filed with the District Court by no later than July 15, 2008.

(Doc. No. 3145, Ex. 1 at 1-2.)

Ten attorneys and/or law firms filed seventeen objections to the R&R.[9]  These objections summarized arguments presented previously in both the motions to reconsider and the petitions to the Special Masters.

## III.    Work Required for Individual Claimants

Based on the Court's review of the petitions and objections, the Court recognizes that individual attorneys were required to complete a great deal of work on behalf of their clients, some work that was inherent in the MDL and some work that could not be attributed specifically to the MDL.  To date, the Court has issued thirty-six pretrial orders ("PTOs") that allowed, among other things, Guidant to require Claimants with cases filed in the MDL to:  (1) complete a lengthy Plaintiff Fact Sheet ("PFS"); (2) provide copies of any medical records and other relevant documents that those Claimants had in their possession; and (3) sign a HIPPA release form.  Further, these PTOs allowed Guidant to test any explanted devices in those Claimants' possession.  The PTOs also required Guidant to complete a Defendant's Fact Sheet ("DFS") for those Claimants with cases filed in the MDL.  The Court, both formally and informally, issued Orders relating to disputes concerning the PFS and DFS.

The Court's *de novo* review of the sixty-seven petitions reveals that many attorneys spent a substantial amount of time completing and reviewing documents

---

[9]       The following ten attorneys and/or law firms filed objections to the R&R: (1) Becnel Law Firm, LLC; (2) Lewis, Kullman, Sterbcow, & Abramson; (3) Preti, Flaherty, Beliveau & Pachios, LLP; (4) The Mulligan Law Firm; (5) Meiselman, Denlea, Packman, Carton & Eberz, P.C.; (6) Martinez, Manglardi, Diez-Arguelles & Tejedor, P.A.; (7) Robert W. Kerpsack Co., L.P.A.; (8) Hersh & Hersh; (9) Audet & Partners, LLP; and (10) Hill, Bean-Ward, Kruse, Wilson & Wright, LLC.

required by these PTOs.  Based on the Court's involvement with issues related to both the PFS and DFS, however, it is apparent that some Claimants' attorneys spent an inordinate amount of time on these issues because they failed to complete the PFS within the time proscribed or in conformity with the PTO requirements.  But, it is also apparent that Guidant's demanding and rigid completion criteria[10]  caused some Claimants' attorneys to expend an excessive amount of time completing paperwork.

After the MSA was signed, the PSC and Guidant required Claimants and their attorneys to complete several documents, some of which appear to be redundant:  (1) a two-page Settlement Consideration Form ("SCF"); (2) an SCF cover-sheet wherein attorneys indicated which category of recovery a Claimant was seeking; (3) a counsel's declaration as required by the MSA; (4) a Claimant's declaration as required by the MSA; (5) a notarized release; (6) if a Claimant had a filed court case, a stipulation of dismissal;  and (7) a lien declaration.  In addition, Claimants were required to provide additional documents and information, depending on the category of recovery sought.[11]

---

[10]  For example, the Court is aware of some Claimants' attorneys complaining that if they left an answer blank instead of writing "not applicable or n/a," Guidant considered that PFS to be deficient, even if no answer was required.

[11]  From the Court's review of the petitions, it is apparent that many attorneys incurred high expenses related to accessing certain medical records.  Depending on when these records were ordered, however, it is possible that certain expenses could have been avoided if the records were ordered sooner (thus reducing the cost of expedited record delivery) and/or if only records from the dates of implant and explant were ordered, especially for those individuals who became Claimants after July 2007.  For future cases similar to this MDL, the Court urges counsel to be diligent in keeping expenses down by selectively choosing which medical records to seek, depending, of course, on that case's particular requirements.

After these documents pass a 48-point Guidant-generated checklist administered by the Claims Administrator, Guidant itself reviews each of the documents for material deficiencies.[12]

Finally, Guidant also required attorneys for the approximately 1,770 deceased Claimants to complete additional documents as part of the so-called "death protocol." Some of these are actual wrongful death Claimants, but the majority of the 1,770 are not alleged to have died as a result of a defective device. Guidant has required the attorneys for each of these deceased Claimants to engage in a rather complicated process in order to obtain a release for the settlement, including requiring some to return to state court in order to have a representative appointed to sign a release of the claim. From the time that the MSA was signed until late June 2008, no one exactly understood what Guidant's death protocol demands were. (*See* Doc. Nos. 2877, 3035, & 3036 (discussing, in part, the parties' and the Court's efforts related to the death protocol).) In any event, the amount of time spent on the death protocol is considerable and has resulted in further delays in the disbursement of all Claimants' recovery.

---

[12]     A great deal of time and money has been wasted dealing with the 48-point checklist because many settlement forms have been submitted in an incomplete fashion. In the Court's view, the primary cause of these incomplete submissions are a certain number of law firms with large case inventories who, for reasons unknown to the Court, have repeatedly submitted inadequately completed forms. And, even after these firms are contacted to correct the deficiencies, these same attorneys return documents with significant errors remaining.

## DISCUSSION

### I.      Inherent Authority

As discussed in the March 7, 2008 Order, the Court has the inherent right and responsibility to supervise the members of its bar in both individual and mass actions, including the right to review contingency fee contracts for fairness.  *See, e.g., Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.,* 623 F.2d 1255, 1277 (8th Cir. 1980) ("The court has the power and the responsibility to monitor contingency fee agreements for reasonableness.").  "Even when the validity of the fee contract itself has not been challenged by the parties, it is within the court's inherent power of supervision over the bar to examine the attorney's fee for conformance with the reasonable standard of the Code of Ethics."  *Rosquist v. The Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982).  In other words, the court has the authority to inquire into fee arrangements to protect clients from excessive fees and suspected conflicts of interest.  *In re Michaelson*, 511 F.2d 882, 888 (9th Cir. 1975).

Just as tortfeasors must take their victims as they find them, attorneys who agree to represent Claimants must take those Claimants as they find them.  For instance, attorneys here knew that they were taking cases for a vulnerable population—many, if not most, of the Claimants were elderly and in poor health.  And attorneys knew that this type of litigation is often consolidated into an MDL at the request of either the plaintiffs, as in this MDL, or defendants.  Thus, attorneys representing MDL Claimants must accept both the costs and benefits associated with participation in the MDL.

One of the costs associated with an MDL is that Claimants and their attorneys may believe that they are forced into the MDL when they would rather proceed on an individual basis, either in state or federal court.  Certainly, the nature of the MDL results in an individual Claimant losing some control or autonomy over the claim.  In addition, some attorneys complain about the time spent completing forms that may have been drafted by others without much thought given to the time needed to complete them.  In this sense, some MDL attorneys are left feeling more like claims administrators than litigators.  Another cost inherent in an MDL is the imposition of common benefit fees and expenses.  *See In re Nineteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 606 (1st Cir. 1992) (explaining that a court supervising mass tort litigation should attempt to avoid unjust enrichment of persons who benefit from a lawsuit without shouldering its costs).  Here, in its March 7, 2008 Order, the Court ordered that $10,000,000 of the $240,000,000 settlement fund be set aside for common costs and that $34,500,000.00 (15% of $230,000,000.00; 14.375% of $240,000,000.00) be set aside for common benefit attorney fees.  (Doc. No. 2636 at 47.)

But the benefits of the MDL are many.  One of the benefits associated with an MDL is that Claimants' attorneys generally benefit from economies of scale related to coordinated discovery, motion practice, and global settlement negotiations because they are not required to do certain work that they would otherwise do in an individual case. Specifically in this MDL, individual attorneys were not required to perform much pretrial work because most work on individual cases should have ceased pending the bellwether trials.  In addition, attorneys with large numbers of clients should have experienced

economies of scale when completing PFSs, SCFs, and related documents.  And the

Garretson Law Firm, the Medicare/Medicaid Lien Administrator appointed under the

MSA, saved individual attorneys and Claimants a significant amount of time and money

by negotiating global settlements with federal and state healthcare agencies.  Further, as

noted by many attorneys who petitioned for a contingency fee increase, individual

Claimants ultimately benefited by the leverage created by the large number of Claimants

in the MDL pool.

With these costs and benefits in mind, the Court turns to its responsibility to

review Claimants' attorneys' contingency fee contracts for fairness.

## II.       Changed Circumstances

When the Court capped individual contingency fees at 20%, it noted that

"although the fee arrangements may have been fair when the individual litigations were

commenced, the Court concludes that many of the fee arrangements are likely not fair

now because of the common benefit work and [other] economies of scale."

Doc. No. 2636 at 43; *see also In re Zyprexa Products Liability Litigation*, 424

F. Supp. 2d 488, 493 (E.D.N.Y. 2006) (noting that fee arrangements that may have been

fair at the commencement of litigation need to be reexamined in light of the MDL

proceedings).  After an exhaustive review of the sixty-seven petitions, the R&R, and the

seventeen objections to the R&R, it is apparent that many of the Claimants' attorneys

expended additional hours of work that the Court did not anticipate in March 2007.

Thus, what was a fair cap in March 2007 is no longer fair now.

For example, a review of the seven settlement forms, Guidant's 48-point checklist, and the petitions and objections reveals that the forms (especially for attorneys who had a small number of clients) likely took many more hours to complete than previously thought.  In addition, the payment of the settlement proceeds has been delayed for at least one year.  This delay has dramatically decreased the perceived value of a quick settlement.[13]  And the delay understandably upset many Claimants, and attorneys had to expend a great deal of time assuring Claimants that the settlement was indeed progressing.  Moreover, although attorneys who took cases involving extremely ill or deceased Claimants should have anticipated some additional probate-related work when they entered into their contingency fee contracts, the Court doubts that most attorneys anticipated the amount of work required by Guidant's death protocol, especially since most of the 1,770 claims are not true wrongful death claims.[14]

Attorneys with MDL cases have a responsibility to minimize costs to their clients by maximizing the economies of scale and the value of the common benefit pretrial work.  Claimants should not bear the large costs of advertising and screening simply because their attorneys cast the net too wide in an attempt to attract clients.  Referral fee

---

[13]     In retrospect, the parties should have anticipated some delay, given  (1) the complicated and, in contrast, sometimes open-ended, procedures set forth in the jointly-drafted MSA; (2) the propensity of certain Claimants' counsel to repeatedly submit incomplete forms; and (3) Guidant's sometimes picayune rejections of "deficient" documents.

[14]     In retrospect, however, perhaps the attorneys should have anticipated some increased amount of work, given Guidant's actions related to the PFSs and SCFs and the MSA provisions concerning deceased Claimants.

arrangements or costs associated with operating law firms in large cities do not justify high contingency fees.  And given the national legal landscape, it should have come as no surprise that cases filed before the MDL was put in place might ultimately be included in an MDL.

Nevertheless, MDL attorneys do have a right to recover reasonable attorney fees, especially for actual work performed for Claimants, including, but not limited to, reviewing medical records and performing preliminary research; drafting and filing pleadings prior to cases joining the MDL; creating databases, newsletters, and websites to facilitate communication with clients; assisting with probate and bankruptcy proceedings; and using their best efforts to complete all of the necessary settlement-related paperwork. In addition, small firms or solo practitioners with a minimal number of clients do not benefit from any economies of scale and most often are not receiving common benefit fees.  These attorneys should be reasonably compensated for their efforts.

Considering the changed circumstances and recognizing attorneys' right to recover reasonable fees, the Court carefully considered the Special Masters' recommendation that the Court increase the cap for all contingency fees to 25%.  The Court recognizes the merit and simplicity of an across-the-board cap.  Yet an across-the-board 25% cap does not take into account contractual limits imposed by individual contingency fee contracts. Specifically, an across-the-board 25% cap would allow, in cases where Claimants

contracted for a 33-1/3% contingency fee, the total amount of attorney fees (contingency *plus* common benefit) to exceed such Claimants' contracted-for amount.[15]

Given this and based on the Court's general equitable powers, its inherent authority to exercise ethical supervision over this global settlement, and its inherent authority to review contingency fee contracts for fairness, the Court respectfully rejects the R&R.  Instead, the Court adopts the formula described below.[16]

## III.    Revised Fees Formula

The Court considered various mathematical formulas before devising a revised fees formula ("RFF") that results in Claimants paying no more on a percentage basis for attorney fees (contingency *plus* common benefit attorney fees) than:  (1) the percentage contracted for in their contingency/retainer agreement; (2) 37.18%; or (3) the state-imposed limit,[17] *whichever of these three is less*.  This formula produces an approximately 30% reduction of fees for attorneys with both 33-1/3% and 40%

---

[15]    Allowing an across-the-board 25% cap would result in 34.74% of the total settlement amount going toward attorney fees ((25% of $195,500,000 = $48,875,000) + ($34,500,000 common benefit attorney fees) = $83,375,000, an amount which is 34.74% of the total settlement amount).  This creates a situation whereby Claimants who contracted for 33-1/3% contingency fees would, in fact, be subsidizing higher contingency fees for all attorneys.

[16]    The Court recognizes that attorneys for approximately 7,000 Claimants did not petition for a fee increase and that they nevertheless benefit from this formula.  This is a consequence of the Court's desire for a consistent and fair result for both Claimants and their attorneys.

[17]    In recognizing state-imposed limits as a variable of the RFF, the Court also expects individual attorneys to take into account the applicable state law as to whether the contingency fee is calculated as a percentage of the Claimant's gross or net recovery.

contingency contracts.[18]  The RFF honors individual Claimants' contingency contracts to the extent that individual Claimants will never pay a greater percentage of attorney fees, as a whole, than their contracted-for amounts.  And the RFF ensures that attorneys with lower contingency rate contracts are not subsidizing attorneys with higher contingency rate contracts.

The RFF also assumes that Claimants should absorb the $10,000,000 in common costs as a result of having been included in the MDL.  In this way, Claimants and their attorneys both are "taxed" with participating in the MDL.  The Court believes that the RFF reaches a fair, reasonable, and equitable result for both Claimants and their attorneys because individual attorneys should not reap the rewards of collecting their entire contingency fees (at the expense of the individual Claimants) when they did not do all of the work that ultimately resulted in settlement of the MDL.

The RFF is as follows:

Using the following variables:

> S = Total Settlement Amount
> CC = Common Costs
> CF = Contingency Fee Arrangement (lesser of % contracted for, 37.18%, or the state-imposed limit)
> CBAF = Common Benefit Attorney Fees
> TAF = Total Attorney Fees
> RFP = Revised Fee Percentage (amount that individual attorneys can collect on a contingency fee basis)

---

[18]     The Court recognizes that some attorneys have 50% contingency fee contracts with their clients.  Based on the unique contours of this case, the Court finds those contracts to be *per se* unreasonable.

And the following 3-step equations:

$$CBAF = ((S-CC)* 15\%) \qquad \text{(eq.1)}$$
$$TAF = (S * CF) \qquad \text{(eq. 2)}$$
$$RFP = (TAF - CBAF) / (S-CC-CBAF) \qquad \text{(eq. 3)}$$

Therefore, assuming a \$240,000,000 settlement,[19] under the RFF, attorneys with 40% and 33-1/3% contingency contracts can recover the following:

Where Claimant has contracted for (and state-imposed limit allows) a 40% contingency using equations (1-3):

$$CBAF = ((S-CC)* 15\%) = ((\$240MM - \$10MM) * .15) = \$34.5MM$$
$$TAF = (S * CF) = (\$240MM * .3718) = \$89.23MM$$
$$RFP = (TAF - CBAF) / (S-CC-CBAF) = (\$89.23MM - \$34.5MM) /$$
$$(\$240MM - \$10MM - \$34.5MM) = \mathbf{.28 \text{ or } 28\%}[20]$$

Actual Fee Discount: (40% - 28%) / (40%) = 30%

Where Claimant has contracted for (and state-imposed limit allows) a 33-1/3% contingency using equations (1-3):

$$CBAF = ((S-CC)* 15\%) = ((\$240MM - \$10MM) * .15) = \$34.5MM$$
$$TAF = (S * CF) = (\$240MM * .33333) = \$80MM$$
$$RFP = (TAF - CBAF) / (S-CC-CBAF) = (\$80MM - \$34.5MM) /$$
$$(\$240MM - \$10MM - \$34.5MM) = \mathbf{.2327 \text{ or } 23.27\%}[21]$$

Actual Fee Discount: (33.33% - 23.27%) / (33.33%) = 30.2%

---

[19]    The Court recognizes that, pursuant to § II.A.1. of the MSA, the Total Settlement Amount, and thus the dollar amount of the Common Benefit Attorney Fees, could vary depending on the number of Participating Claimants in the settlement. In addition, the Court notes that if Common Costs exceed \$10,000,000, any overruns will be paid from the Common Benefit Attorney Fee allocation. Thus, the Common Benefit Attorney Fee allocation will be reduced by any amount of Common Costs that are in excess of \$10,000,000. Any amount of the Common Cost allocation that is not spent will be redistributed among the Claimants' recovery.

[20]    A variation in the Total Settlement Amount, as noted in footnote 19, *supra*, could slightly alter the percentage of contingency fee allowed.

[21]    *See* fn 20, *supra*.

## CONCLUSION

As the Court has previously noted, courts have a vested interest in attorney fee contracts. The fairness of the terms of such agreements reflects directly on the Court and the legal profession. The Court recognizes that a great deal of public condemnation is directed toward contingency fee agreements. Yet contingency fee contracts serve many functions, most importantly providing access to the courts for those who cannot afford to pay attorney fees and costs upfront. And because attorneys assume financial risk by entering into contingency fee agreements, ideally such agreements also should reduce the number of meritless cases and inspire attorneys to work diligently on their clients' cases.

In the majority of cases in this MDL, the Court believes that contingency fee contracts have worked just as they should. Unfortunately, the Court has observed instances where this has not always occurred. For example, the Court has received numerous communications from Claimants stating that their attorneys have never contacted them or that their attorneys are making the Claimants complete, by themselves, all of the settlement documents. The Court is not surprised by some of these communications because often the Court has had difficulty getting responses from these same attorneys, even when responses were required by Court Orders. Some attorneys have filed documents with the Court that are wholly incomplete, based on the wrong local rules, or submitted in handwritten form. Some attorneys have filed cases purportedly for living Claimants when, in reality, those Claimants were already deceased. Other attorneys have admitted that they cannot locate their clients. And some attorneys with referral arrangements are not sure whether or not a Claimant is their client, so two or

more attorneys from different firms have filed cases on behalf of one Claimant. Finally, a few firms with large inventories have put very little effort into completing the settlement documents, relying instead on the PSC and Claims Administrator to finalize those documents in a form that is acceptable to Guidant. The Court sincerely hopes that these instances are the exception, rather than rule.[22]

Since the MSA was finalized, Guidant has consistently taken the position that it does not have "a dog in the fight" over attorney fees. To some extent, Guidant's actions suggest otherwise. At least some of the delays and resulting increased administrative and common benefit costs are attributable to the inflexible position Guidant took on many aspects of this litigation. Guidant's demanding (some may say unreasonable) approach often resulted in individual attorneys having to perform significant administrative work on behalf of Claimants—work that was not demanded in other MDLs of this nature.

Some may argue that Guidant suffered from their own demanding approach because ultimately, any increase in attorney fees (whether contingency or common benefit) reduced Claimants' recovery and thus reduced any goodwill that Guidant may have earned as a result of the settlement. Yet there are those who may suggest that defendants have a marked interest in driving up attorney fees and reducing plaintiffs' recoveries in an effort to fuel public sentiment toward tort reform legislation that is ultimately more favorable to defendant corporations. Here, the Court assumes that both

---

[22] The Court reserves the right to require certain individual attorneys and/or their law firms to pay fees to the common benefit fund as a sanction for their behavior if the Court determines that these firms have contributed to the common detriment of the MDL.

Claimants' attorneys and Guidant's attorneys simply acted as zealous advocates for their clients.

By capping the total attorney fees (contingency *plus* common benefit) at a maximum of 37.18%, the Court does not intend to make a statement that across-the-board attorney fees of 40% are acceptable in any MDL situation. The Court flatly rejects that notion. Here, in fact, the maximum amount of contingency fees that any firm will be allowed to collect is approximately 28%.[23] It is only because of the unique facts and contours of this MDL, and because of the changed circumstances since the Court's March 7, 2008 Order, that the Court finds an upward departure from 20% to be both necessary and reasonable.

In sum, MDL cases involve give-and-take. Common benefit attorneys take typical pretrial work, such as discovery and motion practice, away from individual attorneys. And MDLs give individual attorneys some MDL-specific tasks, such as the completion of PFSs, SCFs, and related documents, and compliance with the numerous PTOs—work that individual attorneys likely would not have had to complete if the case were not in an MDL setting. The RFF attempts to capture the give-and-take in this MDL by apportioning the total amount of attorney fees that Claimants owe between the two sources of attorneys who performed work that benefited the Claimants—the individual attorneys and the common benefit attorneys.

---

[23] This percentage could vary slightly in the event that the total settlement amount changes. *See* fn. 20, *supra*.

Thus, based on the Court's *de novo* review of the sixty-seven petitions and the seventeen objections, the pleadings, procedural history and record before the Court, **IT IS HEREBY ORDERED** that:

1.     The Court **OVERRULES** the seventeen objections (Doc. Nos. 3127, 3130, 3132-3144, 3154-3155, and 3163-3168 and Civ. No. 06-1818 (DWF/AJB), Doc. No. 5) and respectfully **DECLINES TO ADOPT** on other grounds the Special Masters' June 30, 2008 Report and Recommendation (Doc. No. 3145).

2.     Attorneys' contingency fees shall be calculated on a Claimant-by-Claimant basis, consistent with the Revised Fees Formula described in this Order.

3.     Individual attorneys shall inform their clients that their contingency fees have been changed as a result of this Order.  Individual attorneys must retain records demonstrating they have so informed their clients and demonstrating that they have complied with the Order in their assessment of attorney fees.  Failure to do so could result in sanctions.

4.     The Court reserves the right to require individual attorneys to submit affidavits of compliance with this Order and to submit copies of the records ordered in paragraph 3, above.

Dated:  August 21, 2008                    s/Donovan W. Frank
                                           DONOVAN W. FRANK
                                           Judge of United States District Court