In re: GUIDANT CORP. IMPLANTABLE DEFIBRILLATORS PRODUCTS LIABILITY LITIGATION

This document applies to:

ALL ACTIONS

MDL No. 05-1708 (DWF/AJB)

## ORDER SANCTIONING PATRICK J. MULLIGAN, ESQ.

## INTRODUCTION

There is no wonder why the general public has such a poor perception of attorneys when one examines the conduct of Patrick J. Mulligan, Esq., in this litigation. Mr. Mulligan's conduct has added to the common detriment of this MDL and sullied the legal profession for us all.

On May 7, 2009, the Court held a status conference with Mr. Mulligan to discuss a variety of communications the Court had received from some of Mr. Mulligan's MDL clients. As discussed in the Court's previous Orders concerning Mr. Mulligan, these clients had contacted the Court directly about the Mulligan Law Firm's lack of communication with them and, more importantly, the fact that the Mulligan Law Firm never communicated the projected range of the clients' proposed settlement awards at the time that the clients were asked to sign settlement documents. After the status conference, the Court asked for more information from Mr. Mulligan and reserved the

right to formally sanction Mr. Mulligan for his actions in this MDL.  (Doc. No. 3856.[1])

Mr. Mulligan submitted the requested information on May 26, 2009, and again on

June 19, 2009.  (Doc. Nos. 3864 and 3933.)

After reviewing the information submitted after the May 7, 2009 conference and

for the reasons stated below, the Court fines Mr. Mulligan $50,000 for his contribution to

the common detriment of this MDL.  In addition, the Court will forward a copy of this

Order to the Minnesota Office of Lawyers Professional Responsibility, the Office of

Chief Disciplinary Counsel for State Bar of Texas, and to the appropriate ethics boards in

all states or territories in which a Guidant MDL client of Mr. Mulligan's resides.

## BACKGROUND

### I.    General Background

The background of this MDL is set forth more fully in the Court's previous orders,

most notably in the Court's March 7, 2008 Order.  (*See* Doc. No. 2636.)  Briefly, this

MDL commenced in November 2005 when the Judicial Panel on Multidistrict Litigation

consolidated certain actions and transferred them to the District of Minnesota for pre-trial

proceedings against Defendants Guidant Corporation, Guidant Sales Corporation, and

Cardiac Pacemakers, Inc. (collectively, "Guidant").  Individual claimants[2] commenced

---

[1]    Unless otherwise noted, all docket numbers referenced in this Order are to MDL 05-1708 (DWF/AJB).

[2]    For the sake of consistency and simplicity, the Court will refer to the parties who are subject to the terms of the Master Settlement Agreement and the jurisdiction of this Court as "claimants," consistent with §§ I.D, III.F, and VI.A-B of the Master Settlement Agreement.

these actions against Guidant for injuries alleged to have been caused by certain defective implantable defibrillator devices and pacemakers manufactured by Guidant.

From early 2006 through July 2007, the parties[3] conducted extensive discovery, engaged in motion practice, and prepared for five bellwether trials. Shortly before the first bellwether trial was to begin in July 2007, the parties entered into a proposed settlement. Later, the parties signed a term sheet with a negotiated settlement fund of $195 million. Soon thereafter, the parties commenced a renegotiation process that lasted approximately four months. The renegotiation process resulted in a new term sheet, increasing the total settlement fund to $240 million. Nearly five months after the first proposed settlement was reached, the parties finally entered into a confidential Master Settlement Agreement ("MSA") on December 10, 2007. Since that time, the parties have been working through the claims administration process, which is discussed in detail below. To date, the vast majority of participating claimants have received at least a partial payment for their claims.

## II.    Settlement Allocation Process

The Court asked the Plaintiffs' Lead Counsel Committee ("PLCC") to provide, among other things, a timeline of communications provided to claimants' counsel regarding the settlement allocation process and the PLCC's opinion on whether claimants' attorneys should have disclosed settlement ranges to their clients. The PLCC

---

[3]    Only certain plaintiffs' lawyers participated in this phase of the litigation. Mr. Mulligan was not one of them. (*See* Doc. No. 3558 (awarding common benefit fees to specific attorneys).

did so on June 24, 2009.  (Doc. No. 3943.)  Below is a summary of that information, together with a discussion of other documents related to the settlement allocation process.

Any discussion of the settlement allocation process necessarily begins with Section C.I of the MSA.  That section provides:

> ***Allocation of the Settlement Fund***:  The Special Masters will determine, in their sole discretion, how to allocate the Settlement Fund to all Participating Claimants, including whether to categorize certain claims as similar and to award all such claims like amounts, and/or whether to make individual determinations for all or some claims consistent with the terms of this MSA.

(MSA at 13.)  The PLCC intended, and the Special Masters agreed, that the Special Masters would be guided by an allocation plan proposed by the PLCC and approved by the Special Masters.  The allocation plan provided a formula for allocating base awards, a procedure for an allocation committee to review submissions and make recommendations to the Special Masters, and criteria to guide the Special Masters in allocating enhanced injury awards.

The PLCC believed that "the settlement and allocation processes would be processed by Counsel in parallel, yet interdependent, tracks; with information regarding both elements of the process flowing simultaneously."  (Doc. No. 3943 at 7.)  According to the PLCC, it was their intention to "provide information that was available, at the time, to claimants' Counsel so that they could assist their clients in making the best decision regarding settlement participation based on both legal analysis and allocation estimations."  (*Id*. at 11.)  The PLCC believed that claimants' counsel would either "provide each claimant with an estimated base allocation" or "if not a base allocation, at

least a range in which Counsel estimates their settlement allocation would fall." (*Id*.) If claimants' counsel had any questions regarding the settlement process, the PLCC was available to answer any questions about the process. Based on questions and inquiries received by the PLCC, the committee believes that other claimants' counsel were making allocation calculations or estimations. (*Id*. at 12.)

Shortly after the MSA was finalized and throughout the Spring of 2008, the PLCC had informational meetings and conference calls with claimants' counsel to discuss the settlement paperwork and draft allocation plans. The PLCC also sent numerous e-mails to claimants' counsel explaining the settlement process. The first part of the settlement process involved completion of a Settlement Consideration Form ("SCF"), which, if completed, allowed a claimant to be considered as an "eligible claimant" and part of the list of 8,550 claimants. As of January 8, 2008, all claimants' counsel knew whether their clients were on the 8,550 list and therefore eligible claimants. On January 9, 2008, the PLCC sent a copy of a proposed allocation plan to claimants' counsel to assist them "in being able to make an educated decision about whether they could recommend the Guidant Settlement Program to their clients." (*Id*. at 7-8.) The proposed allocation plan included projected base allocation amounts. At that time, the PLCC provided claimants' counsel with a "Supplementation Protocol," which outlined the expected documents required to provide proof of various claims.

The PLCC also held conference calls with claimants' counsel to discuss the impact of *Riegel v. Medtronic*, 552 U.S. 312 (2008), the then-recent United States Supreme Court case that addressed the circumstances under which the federal Food and Drug

Administration's pre-market approval process preempts state tort claims against device manufacturers. Finally, the PLCC also held conference calls to discuss a protocol for dealing with Medicare/Medicaid issues and other third-party liens.

On February 19, 2008, the PLCC sent a copy of the settlement documents to claimants' counsel, including a copy of the Supplementation Protocol that the Special Masters filed on February 14, 2008. According to the PLCC, the Supplementation Protocol was "substantially the same as the proposed protocol sent around to Counsel on January 9, 2008," and "Claimants' Counsel recommendations and claimants' decisions rested heavily on both the settlement documents and the allocation information available." (Doc. No. 3943 at 8.) Those documents included three documents that claimants had to sign, specifically a Claimant's Declaration, a Confidential Release, Indemnity, and Assignment ("Release"), and a Lien Certification (collectively, claimants' settlement documents."). Under the MSA, if a claimant submitted all claimants' settlement documents with a "good faith effort," he or she was considered a "participating claimant." (MSA at 11.)

In the Claimant's Declaration, a claimant was required to declare that he or she had received and read the MSA and that "I have had the opportunity to discuss the MSA and all of its exhibits with my counsel." (MSA, Ex. A at 1.) The declaration further states "I further understand that Special Masters will determine, in their sole discretion, how to allocate the Settlement Fund. However, by submitting this Declaration, I am agreeing to be bound by the determination of the Special Masters." (*Id*.) In the Release, a claimant acknowledged that he or she had reviewed the MSA and understood the

Special Masters' role.  The Release further states:  "Claimants and Claimants' Counsel acknowledge and agree that, to the best of their knowledge, this Settlement is fair, reasonable, and in accordance with all requirements of applicable laws, statutes, rules, and decisions."  (MSA, Ex. B, Section F.)  Pursuant to the terms of the MSA, the Release became effective at the time of the Special Masters' Allocation Report, as required by Section IV.C.2 of the MSA.  (*Id*.)

On March 19, 2008, the Special Masters signed an Order approving the Guidant Settlement Allocation Plan proposed by the Plaintiffs' Allocation Committee.  (Doc. No. 2654.)  A copy of that Order was sent to all claimants' counsel on March 20, 2008. The Settlement Allocation Plan announced factors to be included in the calculation of a claimant's base allocation award, including fixed and known facts such as what type of device was implanted, whether a device was explanted, the duration of time between implant and explant, and whether a claimant's device was recalled.  Pursuant to the Settlement Allocation Plan, claimants were placed in different categories, referred to as Category I and Category II, depending on whether their devices were implanted or explanted.  With respect to explants, there was a formula for determining an enhancement based on when the device was explanted.  A third category was established for an Enhanced Injury Fund ("EIF").  The EIF necessarily did not include fixed and known factors because those factors were to be evaluated by a claims' committee based on what type of documentation a claimant submitted to support an application for an EIF award. Therefore, the PLCC did not anticipate claimants' counsel giving claimants ranges on

EIF awards, but it did anticipate counsel being able to give ranges on base allocations. (Doc. No. 3943 at 11-12.)

Throughout 2008, in response to specific requests by the parties, the Court extended multiple times the deadlines for claimants to submit the claimants' settlement documents. The PLCC believes that the "extension of the deadlines made it even more reasonable to assume that at some point during the settlement process, claimants' Counsel could advise their clients of the estimated allocation they could receive under the settlement if they provided the required documents." (Doc. No. 3943 at 8.)

On August 1, 2008, the Special Masters appointed nine attorneys to participate in the Claims Review Committee ("CRC"), and on August 7, 2008, the Special Masters issued a Settlement Claims Review Protocol, which concerned the claims review process rather than allocation amounts. By October 20, 2008, the CRC forwarded to claimants' counsel a spreadsheet of allocations for claimants who had not sought an award from the EIF. By October 31, 2008, the CRC forwarded to claimants' counsel a spreadsheet of allocations for claimants who had sought an award from the EIF. Both non-EIF and EIF claimants had an opportunity to amend and/or correct allocation submissions to object to the CRC (and later the Special Masters) concerning the base allocations awards and EIF awards for Category I and Category II allocations. Importantly, the base recovery amounts for Category I and Category II allocations never changed from the fixed and known formula that was approved of by the Special Masters on March 19, 2008.

The first settlement awards were partially paid beginning at the end of December 2008, after the first allocation order was issued. (Doc. No. 3403.) A claimant became a

"payment-eligible" claimant when he or she was listed on an allocation award order and had completed two or three documents in addition to the claimants' settlement documents.

### III.    Mr. Mulligan's Communications with His Clients

The Court asked Mr. Mulligan to submit copies of all standard or form communications he sent to his clients and to provide the Court with a spreadsheet listing each of his clients who are Guidant claimants by name and the dates on which those clients signed their settlement documents.  (Doc. No. 3867.)  Mr. Mulligan did so on June 19, 2009, explaining that he was providing the Court with copies of all communications his firm made to claimant Robert Pena Ayala because Mr. Ayala's file was representative of the standard communications Mr. Mulligan had with his clients. (Doc No. 3933.)  Below is a summary of those communications directly related to the issue of Mr. Mulligan's settlement allocation discussions with his clients.

On July 20, 2007, Mr. Mulligan[4] first announced a tentative Guidant settlement to his clients.  He explained that the exact settlement amounts would be determined by an allocation process headed by the Special Masters:  "The mechanism's details are currently being developed, but rest assured that adequate and timely data will be available to you so that you can make an informed decision regarding whether or not to accept that settlement offer that will eventually be made to you."  (Doc. 3933, Ex. 2.)

---

[4]     At least initially, Mr. Mulligan wrote to some of his clients together with the Fox Law Firm.  There is nothing in the record to explain the relationship between the Mulligan Law Firm and the Fox Law Firm.

On February 22, 2008, Mr. Mulligan sent another letter to his clients concerning the Guidant settlement.[5] In it, Mr. Mulligan explained that a recent United States Supreme Court decision, *Riegel*, "severely limited the ability to bring lawsuits for personal injuries against makers of medical devices," and as a result, he informed clients that they "will lose the ability to ever receive monetary damages relating to a Guidant heart device" if they did not participate in the settlement. (Doc. 3933, Ex. 2.) With respect to settlement awards, Mr. Mulligan stated "[t]he exact settlement amount for your claim will be determined through an allocation process headed by [the Special Masters]" and that "we anticipate this process to take two to three months to complete, and we will present you with your individual settlement award at that time." (*Id*.) Mr. Mulligan attached copies of the claimants' settlement documents and the MSA, together with a copy of the Confidentiality Order entered in the Guidant MDL and asked that those documents be completed and returned to him by mid-March 2008.

Mr. Mulligan specifically instructed his staff to respond to any inquiries following the February 22, 2008 letter by not discussing the individual settlement awards and instead only communicating the final settlement award of $240 million for all 8,550

---

[5]     In a July 17, 2008 letter to the Court concerning claimant Bobette Warren, Mr. Mulligan told the Court that he communicated with that client on February 22, 2008, April 14, 2008, and May 5, 2008. The Court does not have copies of the April 14 and May 5 letters but assumes that those letters were copies of the February 22 letter, given that Mr. Mulligan represented to the Court that Mr. Ayala's file was representative of all standard communications that Mr. Mulligan sent to his clients. The Court also received copies of communications written to representatives of device recipient Jonnie Wrice dated February 12, 2007, August 7, 2007, November 7, 2007, and September 19, 2008. Those communications were consistent with those found in Mr. Ayala's files.

claimants.  (Doc. No. 3833, Ex. A; Civ. No. 07-3217 (DWF/AJB), Doc. No. 8 ("my office staff is instructed to not discuss settlement awards or offers until they are final. The only settlement amounts  . . . given were [$240 million] for all 8,550 participating claimants . . . and [eventually] their individual award amount . . ."); 5/7/09 Tr. at 12.)  On this information, the majority of Mr. Mulligan's clients who decided to participate in the settlement signed the appropriate settlement documents between March and May 2008.

Six months after receiving the court-approved settlement allocation plan that contained base allocation awards, Mr. Mulligan sent his clients a Guidant Settlement Update Letter dated September 19, 2008.  In that letter, Mr. Mulligan expressed his frustration with the length of the settlement process and discussed certain terms of the settlement related to participation rates that could impact the final settlement award. With respect to settlement award allocations, Mr. Mulligan stated that the process would not begin until after Guidant makes certain settlement determinations, after which "the Settlement will proceed to award allocation by the Special Masters . . . after which claimants' counsel will be notified of the award allocations for their individual claimants . . . and we will notify you of your original award as soon as we receive that information."  (Doc. 3933, Ex. 2.)

Mr. Mulligan began distributing settlement awards to his clients in January 2009, after the Court issued its first and second allocation orders.  (*See* Doc. No. 3397 and 3771.)  In addition to sending a check to his clients, Mr. Mulligan sent a letter to his clients explaining that this Court had ordered that 75% of the settlement awards allocated by the Special Masters be distributed to claimants.  Included with each letter was a

"Settlement Sheet," which showed the amount of attorney fees and costs deducted from a claimant's settlement allocation. The comments section of the Settlement Sheet stated, among other things, that by cashing the settlement check, the claimant releases "Patrick J. Mulligan and The Mulligan Law Firm, the Special Master and all co-counsel from any and all liability result form [sic] or in association with the aforementioned settlement as I fully understand the terms of the settlement and have accepted same." (Doc. 3933, Ex. 2.) According to Mr. Mulligan's records, this is the first time that his clients were made aware of the monetary amount of their settlement award.

Shortly after the May 7, 2009 status conference, Mr. Mulligan sent another letter to his clients, distancing himself from the allocation process and explaining that the claimants' gross awards may be reduced by a small percentage related to participation-related provisions in the MSA and because of third-party payer liens. Specifically, in a letter dated May 29, 2009, Mr. Mulligan stated:

> The settlement was negotiated by the Plaintiffs' Lead Counsel Committee, also appointed by the Court, in the gross amount of $240 million dollars for 8550 claimants. Our office did not participate in the negotiation of the settlement and was not involved in the allocation of settlement awards. All settlement awards were made by the Special Masters, who were appointed by the Court to make settlement allocations and awards independently and free of any potential conflicts of interest. To date, we have not been provided the individual settlement awards for all 8550 claimants as those are under seal by court order.

(*Id.*)

## IV.    The Court's Interactions with Mr. Mulligan and His Clients

*Mr. Mulligan's Complaints About Contingency Fee Cap*

On March 7, 2008, the Court entered an Order that determined the amount of the common benefit attorney fee and capped individual attorney fees.  (Doc. No. 2636.)  In that Order, the Court allowed a procedure by which individual attorneys could petition the Special Masters for an upward departure from the cap, after which the Court would either approve or decline the Special Masters' recommendation.  (*Id*.)  Mr. Mulligan submitted a petition to the Special Masters dated May 1, 2008.  In it, Mr. Mulligan argued that he was entitled to an upward departure because, among other things, "it is important to note that 353 individual Mulligan claimants, accounting for 26% of the Mulligan Docket, are projected to be allocated settlement amounts of no greater that $500 each."[6]  (Doc. No. 3134, Ex. A at 5.)  When the Special Masters did not recommend a large enough upward departure, Mr. Mulligan submitted an objection to this Court dated July 15, 2008.  In that objection, Mr. Mulligan again used the fact that a large percentage of his clients were going to receive a small monetary recovery to support his objection. (*Id*.)

*Complaints by Mr. Mulligan's Clients*

The Court scheduled the May 7, 2009 status conference in response to numerous complaints it had received from Mr. Mulligan's clients.  The Court received some of

---

[6]    Based on their category of recovery, these clients were not eligible to apply for the EIF and therefore their recovery amounts were fixed.

these complaints in response to letters the Court sent to claimants after Mr. Mulligan sought to withdraw as their counsel. A provision in the MSA required Mr. Mulligan to withdraw as counsel in certain circumstances. In response to the Court's letters, some claimants complained that Mr. Mulligan never sent them any correspondence or responded to their letters or telephone calls. The Court previously sanctioned Mr. Mulligan for that behavior in November 2008. (Doc. No. 3365.)

Other clients complained that Mr. Mulligan failed to inform them of their settlement allocation award before they signed the settlement documents or that they were misled into believing that the $240 million settlement was to be divided equally by, at a minimum, 8,550 claimants. As discussed above, Mr. Mulligan admitted to the Court that he and his staff only informed his clients of the aggregate settlement award of $240 million and that he and his staff never gave his clients individual settlement amounts before they signed the releases and bound themselves to participate in the settlement. (Doc. No. 3833, Ex. A; Civ. No. 07-3217 (DWF/AJB), Doc. No. 8; 5/7/09 Tr. at 12.)

Although Mr. Mulligan has repeatedly admitted withholding the settlement ranges from his clients, Mr. Mulligan maintained at the status conference that he was confident that his clients were given "full disclosure" before they signed the releases and that the clients signed the releases with "informed consent." (5/7/09 Tr. at 5, 12.) He also stated that the "Texas Ethics Board" had issued an Ethics Opinion approving of his practice of not disclosing settlement ranges to his Guidant MDL clients. (*Id*. at 12.) Later (but only in response to a question from the Court as to whether Mr. Mulligan had informed the Texas Ethics Board that he had access to projected ranges of settlements that he did not

share with his clients), Mr. Mulligan indicated that the Texas Ethics Board had merely dismissed a complaint filed against him. (*Id*. at 12-13.) When the board dismissed the complaint, it did not know that Mr. Mulligan had been given a court-approved settlement allocation plan in March 2008.

## V.     Relevant Timeline

The following timeline summarizes key dates to be considered when evaluating whether Mr. Mulligan should have informed his clients of the allocation plan's base awards. Finally, as noted above, the majority of Mr. Mulligan's clients signed their settlement documents between March and May 2008.



**DISCUSSION**

*Standard of Review*

Under its inherent authority noted in a prior Order, the Court reserved the right to sanction certain individual attorneys and/or their firms to pay fees to the common benefit fund if the Court determines that they contributed to the "common detriment of the MDL." (Doc. No. 3201 at 22, n.22.) An MDL creates a unique situation in which a court may create a common fund from which attorney fees will be paid for those attorneys who have worked for the common benefit of all plaintiffs. (*See* Doc. No. 2636 at 10-15 (citing authority for the creation of a common benefit fund).) An MDL also creates a unique situation in which one attorney's actions can contribute to the common detriment of the MDL by, among other things, damaging the public's trust and confidence in the effectiveness and fairness of the MDL. For this reason and under its inherent authority, the Court reserved the right to sanction an attorney for contributing to the common detriment on the Guidant MDL.

The existence in the federal courts of an inherent power "necessary to the exercise of all others" is firmly established. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). The inherent power of the federal courts includes the power to "control admission to its bar and to discipline attorneys who appear before it." *Id*. A court must exercise such power with great caution when fashioning an appropriate sanction, and a court must ensure that an individual receives notice and an opportunity to be heard before imposing

any sanction.[7]  *In re Clark*, 223 F.3d 859, 864 (8th Cir. 2000).  The Eighth Circuit Court

of Appeals has held that a showing of bad faith is not necessary to support a monetary

sanction against counsel, and it has recognized that the bad faith requirement does not

extend "to every possible disciplinary exercise of the court's inherent power, especially

because such an extension would apply the requirement to even the most routine

exercises of inherent power."  *Harlan v. Lewis*, 982 F.2d 1255, 1260 (8th Cir. 1993); *see

also In re Baycol Prods. Litig.*, 2004 WL 1052968 at *17 (D. Minn. Apr. 12, 2004)

(discussing *Harlan*).

        The current issue before the Court is whether Mr. Mulligan has contributed to the

common detriment of this MDL by, among other things, failing to disclose the allocation

plan to his clients.  With great caution and after much deliberation, the Court concludes

that he has.

        In a 14-page memorandum to the Court, Mr. Mulligan provided the Court with

"additional information and analysis on the issue of informed consent."  (Doc. No. 3864

at 1.)  In his filings to the Court, Mr. Mulligan improperly assumes, without discussion,

that the only issue before the Court is that of "informed consent" and that only the Texas

Disciplinary Rules of Professional Conduct apply to his actions.  (Doc. No. 3864; *but see*

Doc. No. 3933, Ex. 4 (in which Mr. Mulligan submits the letter by Geoffrey C. Hazard,

Jr., Esq., offering his expert opinion to support Mr. Mulligan's actions and discussing the

---

[7]        The Court gave Mr. Mulligan notice and an opportunity to be heard both with an
in-person appearance and in submissions to the Court.  (Doc. Nos. 3832, 3856, 3864 and
3933.)

ethical rules of Texas, Minnesota, and California).) Mr. Mulligan is incorrect on both accounts. First, as discussed above, the Court may impose sanctions against Mr. Mulligan based on its inherent authority. Second, the Minnesota Rules of Professional Responsibility apply to Mr. Mulligan's actions.

The Minnesota Rules of Professional Responsibility, as adopted by the Minnesota Supreme Court, apply to attorneys practicing before this Court. D. Minn. L.R. 83.6(d)(2). "Whenever an attorney applies to be admitted or is admitted to this Court for purposes of a particular proceeding (pro hac vice,) the attorney shall be deemed thereby to have conferred disciplinary jurisdiction upon this Court for any alleged misconduct of that attorney arising in the course of or in the preparation for such proceeding." D. Minn. L.R. 83(h). Mr. Mulligan has been admitted to practice pro hac vice in this Court. (Doc. No. 11-1.) Therefore, while Mr. Mulligan may be bound by other states' ethical rules, he is also bound by the Minnesota Rules of Professional Responsibility. *See generally* Linda S. Mullenix, *Multiforum Federal Practice: Ethics and Erie*, 9 Geo. J. Legal Ethics 89 (1995) (examining "the threshold issues relating to the applicable ethical standards in multi-forum federal practice").

Traditional legal ethic rules are based on the one-attorney, one-client model. But as several commentators have discussed, it is impossible for attorneys representing numerous mass tort victims to have the same type of relationship with their clients as do attorneys who represent only one client in one particular case. *See e.g.*, Matthew L. Garretson, *A Practical Approach to Proactive Client-Counseling and Avoiding Conflicts of Interest in Aggregate Settlements*, 6 Loy. J. Pub. Int. L. 19 (2004) (providing

practitioners with practical ideas for avoiding aggregate settlement conflicts and for satisfying individual clients' expectations); Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88 Nw. U.L. Rev. 469 (1994) (explaining that the ethical issues in mass torts are "numerous, troubling, and complex" and that a court "has a duty to insist that lawyers act appropriately toward their clients in terms of adequacy of representation, communication, and fees."). While the Court recognizes that an MDL alters the traditional relationship by placing different pressures on attorneys, it does not believe that participation in an MDL excuses an attorney from serving the best interests of his or her clients.

Mr. Mulligan's actions implicate, at a minimum, Minnesota Rules of Professional Responsibility 1.4 and 1.8. Those rules govern communication and conflicts of interest between an attorney and his or her client. Specifically, in relevant part, those rules provide:

### Rule 1.4. Communication

(a) A lawyer shall
> (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required by these Rules;
>  . . .
>
> (3) keep the client reasonably informed about the status of the matter; [and]
> (4) promptly comply with reasonable requests for information;
>
>  . . .

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

**Rule 1.8. Conflict of Interest:  Current Clients:  Specific Rules**

> . . .

> (g) A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients unless each client gives informed consent in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims involved and of the participation of each person in the settlement.

Minn. Code of Prof. Responsibility 1.4, 1.8; *see also* Minn. Code of Prof. Responsibility 1.4 cmt. 7 (stating that an attorney "may not withhold information to serve the lawyer's own interests or convenience or interests of another person").  While the Court believes that Mr. Mulligan may have violated the Minnesota Rules of Professional Responsibility, it does not reach that precise issue because it is imposing sanctions against Mr. Mulligan under its inherent authority.

*Mr. Mulligan's Rationale*

In his submissions to the Court, Mr. Mulligan explained "the analytical thought process he undertook in deciding how best to communicate with his clients regarding the MDL settlement and why he believed at the time (and still believes today) that his communications were sufficient."  (Doc. No. 3864 at 1.)  In essence, Mr. Mulligan justified his actions by claiming that they "were driven by the particular facts and circumstances of the settlement reached by the [PLCC], combined with the Supreme Court's decision in *Riegel v. Medtronic* . . . ."  (*Id.* at 4, n.2.)  He conceded, however, that he does not believe that his disclosures in this case would necessarily be appropriate in another MDL.

Mr. Mulligan gave five reasons for not informing his clients about the settlement allocation plan. First, he claimed that it would have been misleading to do so when there were not assurances that such ranges would be accurate, given the possibility that the settlement awards could be reduced either by the Special Masters or by other provisions in the MSA. Second, based on his experience representing personal injury clients, Mr. Mulligan asserted that he believed that the more conservative route was to give his clients no range, rather than having them feel that they were mislead into a settlement if the projected range turned out to be inaccurate.[8] Third, based on the terms of the MSA, Mr. Mulligan believed that his clients needed only to know that they were agreeing to release their claims in exchange for an award to be determined by the Court-appointed Special Masters. Fourth, because of *Riegel*, Mr. Mulligan explained that he thought providing a range of settlement values would not have been meaningful because the clients' only choice was to participate in the settlement or receive nothing. Fifth, Mr. Mulligan noted that "as a practical matter," he did not provide settlement ranges because "the proposed settlement allocation plan was not referenced in the MSA or any other settlement documents." (*Id.* at 9.)

Mr. Mulligan believes that his clients gave informed consent to participate in the Guidant settlement because he explained the material terms of the settlement to his

---

[8] Ironically, in two footnotes supporting this argument, Mr. Mulligan acknowledged that his experiences with individual clients show that "when giving a range of possible recoveries, no matter what caveats are attached, clients typically hear only the higher end of the range" and that Texas Disciplinary Rules of Professional Conduct 7.02(a)(3)

(Footnote Continued on Next Page)

clients and told them that the Special Masters, in their sole discretion, would determine

each client's individual awards. Mr. Mulligan alleges that because he did not know a

meaningful dollar range at the time he asked his clients to enter into the settlement,

"communicating a dollar range that turned out to be inaccurate likely would have been far

more misleading . . . than no dollar range at all," especially because he believed that

*Riegel* foreclosed any possibility of his clients having viable claims outside of the

settlement. (*Id*. at 11.) Mr. Mulligan explains that he did not provide his clients with

estimates of their awards because, "as best as he could determine," there were no "final

allocations and awards in place that his clients could effectively and meaningfully rely

upon in evaluating the settlement proposal." (*Id*. at 5.) According to Mr. Mulligan, his

clients "were not being asked to consent to receiving certain dollar amounts or ranges

thereof in exchange for a release but instead were being asked to agree to be a part of a

process whereby their dollar recovery (if any) would be determined by the Special

Masters. . . ." (*Id*. at 6.)

Mr. Mulligan further believes that his actions were in compliance with the Texas

State Bar Rules because the Office of Chief Disciplinary Counsel for State Bar of Texas

dismissed a complaint against him. Robert Pena Ayala, a relative of a Guidant device

recipient, filed a complaint against Mr. Mulligan, claiming that Mr. Mulligan never

informed him as to the amount he might recover as a Guidant claimant and stating that he

---

(Footnote Continued From Previous Page)
prohibit Texas lawyers from providing information that may give clients "unjustified
expectations." (*Id*. at 8, nn. 9 and 10.)

never would have gone through the settlement process for his somewhat small recovery amount.[9]  The Office of Chief Disciplinary Counsel for State Bar of Texas dismissed Mr. Ayala's complaint for failure to allege "a professional misconduct or disability."  (*Id.* at 12, Ex. A (explaining reason for dismissal and classifying the complaint as "an Inquiry").)  The Supreme Court of Texas Board of Disciplinary Appeals later affirmed that dismissal.  (Doc. No. 4017, Ex. A.)

*Court's Analysis*

The Court disagrees with Mr. Mulligan.  By signing the Release, Mr. Mulligan's clients agreed and acknowledged that the settlement was "fair" and "reasonable." Without knowing whether he or she was to receive $1, $500, or $240 million, a client could not agree that a settlement was fair and reasonable.  Mr. Mulligan's failure to understand the mechanics of the MSA, in particular the difference between eligible, participating and payment-eligible claimants, and the mechanics of the settlement process does not excuse his actions.  Indeed, most of Mr. Mulligan's rationale is based on his erroneous interpretation of the MSA and his complaint that he had no control over the settlement process.

---

[9]     A second client, Lacy J. Day, also filed a grievance against Mr. Mulligan, which was dismissed for failure to state a claim.  Mr. Day's complaint against Mr. Mulligan related to his diligence in obtaining medical records.

Mr. Mulligan knew as of January 2008 whether his clients were eligible to participate in the settlement, and he knew as of March 2008 the base allocation amounts. Those base allocation amounts were calculated using fixed factors that Mr. Mulligan should have known about each of his clients. Nevertheless, Mr. Mulligan states that he did not inform his clients of the base allocation amounts because those amounts will be reduced by a provision in the MSA that reduces the $240 million settlement fund when there are fewer than 8,400 "participating claimants" in the settlement. It is true that individual base allocation awards will be reduced slightly because there will be fewer than 8,400 participating claimants in the settlement.[10] This slight reduction, however, does not justify Mr. Mulligan's decision to withhold all information from his clients about the base allocation awards. Mr. Mulligan chose to ignore known facts about the settlement process in his communications with his clients, yet he used those same facts in his communications to the Court concerning contingency fees. Mr. Mulligan's use of the settlement allocation plan as both a sword and a shield belies any argument he may have had regarding his lack of knowledge about base settlement awards.

Moreover, Mr. Mulligan's argument that giving a range of recovery to his clients would give them unjustified expectations is untenable. Repeatedly at the status conference, Mr. Mulligan said that he "tried to answer all of our client's questions and

---

[10]     The final reduction in the $240 million settlement fund is not yet known. It is worth noting, however, that a large percentage of the 8,550 eligible claimants who will be deemed non-participating and used in calculating the $240 million reduction are either Mr. Mulligan's current or former clients. It is anticipated that the $240 million fund will be reduced by over $5 million.

give them the best information based on informed consent and I think we did that in this case." (Tr. at 5.) Specifically, Mr. Mulligan explained:

> And I think you can do it either one of two ways. You can do it the way the other lawyers may have done it by giving them a proposed range, but that presents problems, or you can specifically tell the clients up front that you are going into an aggregate settlement. The Court is supervising this. The money is going to be split—is going to be determined fairly by a Special Master . . . . You always have a lot of problems that I have found in settlements, that if you give ranges, the clients always stick on the top, on the largest number. They always think they have the worst case and they should get the highest number. And in addition, at this point we didn't have any EIF awards.

(TR 8-9.) At least with respect to some claimants, however, Mr. Mulligan's actions created grossly distorted expectations because they were only told of the $240 million amount. Mr. Mulligan would have lowered expectations if he would have used the allocation plan and explained to his clients that he could not give them a range for recoveries from the EIF. In general, early communication about the criteria used to evaluate awards helps to manage expectations, rather than to inflate them.[11]

Presumably, Mr. Mulligan did not provide his clients with a settlement range because some claimants[12] would have chosen not to participate in the settlement for nominal awards. Mr. Mulligan's own self-interest would not have been served if all of

---

[11]    Better practices for communicating with clients would include, but are not limited to, explaining (1) that the lump sum settlement will not be split evenly among the law firm's clients; (2) which factors will be used to evaluate an individual's claim; and (3) how costs and expenses will be deducted from the final awards.

[12]    For instance, Mr. Ayala complained to the Office of Chief Disciplinary Counsel for State Bar of Texas that he would have never "gone through this pain and suffering and agony" had he known he would only receive several thousand dollars."

his clients did not join the settlement, and as a result, he refused to inform his clients of the settlement allocation plan.[13]

Finally, the decision in *Riegel* does not justify his actions. The Court acknowledges that most plaintiffs' lawyers believed at the time of settlement that *Riegel* was the death knell for claims such as those at issue in this MDL. Whether this will hold true for the claims of MDL claimants not participating in the settlement is a matter yet to be decided by the Court, especially in light of the recent announcement that Guidant will plead guilty to two misdemeanor charges related to failure to include information in reports to the U.S. Food and Drug Administration and that Boston Scientific will pay $296 million on behalf of Guidant. *See* Press Release, Boston Scientific, Boston Scientific Announces Agreement With DOJ On Pre-Acquisition Investigation of Guidant (Nov. 6, 2009), http://bostonscientific.mediaroom.com. Regardless of developments post-*Riegel*, there is nothing in that case that erases Mr. Mulligan's obligations to give his clients the information that was readily available and that was needed to make decisions with respect to participation in the settlement.

In light of the foregoing, and with great caution, the Court concludes that Mr. Mulligan's actions have contributed to the common detriment of this MDL. Mr. Mulligan's actions created situations in which his clients signed the claimants'

---

[13]     MDL attorneys with large "inventories" hold a unique position in an MDL because, as Mr. Mulligan did on more than one occasion, they often use their inventories as leverage in making side agreements in the MDL. The Court believes that it has a duty to ensure that such attorneys use their "inventories" to contribute to the common benefit, not detriment, of an MDL.

settlement documents without having all available settlement information given to them. Withholding available information was misleading, and doing so damaged both the integrity of the Guidant MDL and the overall system of justice. Mr. Mulligan's actions contributed to the common detriment of this MDL by, among other things, eroding his clients' trust and confidence in the MDL process and damaging the public's image of the legal profession and the court system. In addition, Mr. Mulligan contributed to the common detriment by causing the PLCC to incur significant additional costs as a result of Mr. Mulligan's actions. Specifically, the PLCC was forced to research and respond to a large number of inquiries from Mr. Mulligan's enraged and bewildered clients and also to work extensively with the many pro se claimants who were Mr. Mulligan's former clients.[14] Ultimately, Mr. Mulligan's conduct contributed to a delay in the disbursement of settlement proceeds for all claimants.

As discussed in previous Orders, the Court has been and continues to be concerned with protecting claimants and the system of justice in this MDL. Lawyers are public servants who are given the privilege, not the right, to practice law. With that privilege, lawyers have a public responsibility to serve the interests of justice. Mr. Mulligan's actions are not compatible with the interests of justice. For these reasons and under its inherent authority, the Court fines Mr. Mulligan $50,000. In addition, the Court will forward a copy of this Order to the Minnesota Office of Lawyers Professional

---

[14] A large portion of pro se claimants in this MDL are former clients of Mr. Mulligan.

Responsibility, the Office of Chief Disciplinary Counsel for State Bar of Texas, and to the appropriate ethics boards in all states or territories in which a Guidant MDL client of Mr. Mulligan's resides.

## CONCLUSION

Mr. Mulligan founded the Mulligan Law Firm on the philosophy that "every individual client's case is extremely important." http://www.mulliganlaw.com (last visited December 14, 2009). The Mulligan Law Firm summarizes its commitment to its clients as follows: "You, the client, are our priority." *Id*. Unfortunately in the Guidant MDL, Mr. Mulligan has neither abided by his firm's philosophy nor made his clients a priority.

As the Court stated at the May 7, 2009 status conference, it is a sad day for the legal profession (in particular those that practice in the area of mass torts) if Mr. Mulligan's conduct towards his clients is the norm. (5/7/09 Tr. at 44.) Indeed, if such a practice were the norm, the Court concludes that multi-district litigation would not serve the interests of litigants or justice and should be discontinued. Luckily, based on the Court's interaction with other claimants' lawyers in this MDL, the Court believes that Mr. Mulligan's conduct is the exception, rather than the rule. (*See also* Doc. No. 3943 (PLCC's response discussing allocation plans in other MDLs).)

In conclusion, based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS ORDERED** that:

1. Mr. Mulligan shall pay $50,000 to the Common Cost Fund as a sanction for his contribution to the common detriment of the Guidant MDL. Mr. Mulligan shall

coordinate with Plaintiffs' Liaison Counsel's office to ensure that the $50,000 is deposited into the proper account.

2.     Mr. Mulligan shall provide the Court with a list of the names and state of residence for each of his clients in the Guidant MDL.

3.     Mr. Mulligan shall comply with this Order no later than January 11, 2010.

Dated:  December 14, 2009                          s/Donovan W. Frank
                                                   DONOVAN W. FRANK
                                                   United States District Judge